[761 NYS2d 608]

PAUL PRIORE, Respondent, v NEW YORK YANKEES et al., Appellants, et al., Defendants.

First Department, May 29, 2003

### APPEARANCES OF COUNSEL

*Edward J. Pavia, Jr.,* of counsel (*Michael F. Mongelli II, P.C.,* attorneys), for respondent.

*Jonathan L. Sulds* of counsel (*Akin Gump Strauss Hauer & Feld, LLP* and *Epstein, Becker & Green, P.C.,* attorneys), for *The New York Yankees* and others, appellants.

*Robert S. Bernstein* of counsel (*Eugene R. Scheiman* on the brief; *Buchanan Ingersoll, P.C.,* attorneys), for Bob Wickman, appellant.

### OPINION OF THE COURT

WALLACH, J.

Plaintiff, the son of a longtime former clubhouse manager for the New York Yankees, began helping his father on a volunteer basis at Yankee Stadium around 1980, at the age of 16. At the start of the 1996 season he was put on the club's payroll as an assistant equipment manager, at $30 per diem. Two thirds of the way into the following season, plaintiff's employment was terminated by defendant Cashman, the team's senior vice-president and general manager, because of plaintiff's suspected involvement in theft of team equipment.

Plaintiff alleges an ulterior motive to his dismissal. He claims that over the course of his employment he became the target of harassment and even physical abuse at the hands of certain team players based upon his sexual orientation. In his deposition he stated that he verbally complained to team manage-

ment, including defendants Cashman and May (the team's administrator for major league baseball operations), regarding this harassment about a dozen times over the period from approximately April 1996 until his dismissal in August 1997, without satisfaction.

Defendants maintain that plaintiff's employment was terminated for legitimate and nondiscriminatory reasons.

Shortly after his dismissal, plaintiff filed a labor relations claim for lost wages. As a result, in October 1997 he recovered net compensation for what appears to be approximately one week's salary.

Plaintiff seeks up to $50 million in damages per claim for (1) disparate treatment in the workplace based on his sexual orientation, (2) defamation of his character stemming from the accusation of theft, (3) emotional distress from accusations of theft and the threat of criminal prosecution, (4) emotional and other injury from being fired for his sexual orientation behind the cover of false accusations of theft, (5) dismissal for having contracted HIV despite that condition having no effect on his ability to perform his duties, and (6) recovery in quantum meruit for six years of employment prior to being placed on the payroll in 1996.

Defendants' motions for summary judgment were initially submitted without the support of sworn statements by anyone with personal knowledge of these events. The management defendants did submit excerpts from plaintiff's deposition, along with plaintiff's three-page, handwritten narrative of *his* version of the facts, dated August 9, 1997. In opposition, plaintiff submitted his *entire* deposition and a discovered memorandum to file by defendant Cashman, dated August 2, 1997. Only in reply did defendants Cashman and May submit very brief affidavits, denying any knowledge of plaintiff's sexual orientation or HIV-positive status prior to the commencement of this action.

Plaintiff's handwritten narrative was addressed "To whom it may concern" and dated just eight days after his firing. In it, he set forth his duties as assistant equipment manager, which included occasionally running across the street to fill fast-food orders for the players. Plaintiff stated that he was initially called to the executive offices on July 26, 1997, and told that the FBI was investigating his possible involvement in the sale of stolen uniforms, which he denied. Then, on August 1, he was again summoned upstairs and accused this time of being involved in the disappearance of 100 uniforms, as well as the

theft of bats and balls. This was the confrontation that precipitated his dismissal later that day.

Defendant Cashman's unsworn memo to file, purportedly created the day after plaintiff's firing, addressed three types of equipment losses. First, it indicated that plaintiff confessed, on August 1, to having given two T-shirts (of the type worn only by the players) to employees at a fast-food·restaurant across the street from Yankee Stadium, explaining that this gift was in exchange for a discount that he passed directly back to the players who had sent him to pick up the food. The memo ridiculed the notion that such high-salaried athletes might have expected such a discount. When plaintiff then fell back on the suggestion that giving these shirts to local employees was good public relations, Cashman assertedly cautioned plaintiff that that decision was not his to make.

Second, the memo addressed the subject of broken bats (i.e., players' personalized bats damaged during the course of a game) which would accumulate in a pile outside the team manager's office until disposed of. Plaintiff had an area designated for his personal belongings in a corner of the equipment room, and he had moved a few of these damaged bats to his personal area, apparently without permission to do so.

Finally, Cashman's inspection of plaintiff's personal area revealed three dozen new baseballs which plaintiff said had come from employees in the Volume Services department who wanted them autographed by players. When pressed on this point, plaintiff identified the source of the balls as someone at Volume Services who had recently been fired.

Up to this point, without any proven allegations of major theft, it appears that plaintiff's dismissal was based on incidents of petty larceny. Such activity would be enough to justify the firing of an employee at will, although a local newspaper article, dated August 3, quoted Cashman to the effect that plaintiff's dismissal was not because of stealing, but rather was based on his "performance and conduct." But an entirely new element was introduced in July 1998, when this lawsuit raised the allegation of sexual discrimination in the workplace.

■ Inasmuch as plaintiff's admissions of petty theft justified his dismissal as an employee at will, the motion court correctly granted defendants summary judgment with respect to the cause of action for defamation. The same reasoning should have been applied to plaintiff's cause of action for emotional distress stemming from the accusation of theft. An employer

certainly has a right to question an employee about suspicions of theft in the workplace, and even to dismiss that employee where there is an admission of guilt. This key ingredient of the at-will relationship cannot be subverted by the discharged employee's resort to a claim for intentional infliction of emotional distress (*Murphy v American Home Prods. Corp.*, 58 NY2d 293 [1983]), no matter how distressing that discharge may have been, unless it can be shown that the employer acted in a reckless manner (*Howell v New York Post Co.*, 81 NY2d 115, 125 [1993])—a condition not borne out by this record.

The court further erred in failing to grant the motion to dismiss the cause of action sounding in quantum meruit, based upon uncompensated services allegedly performed prior to plaintiff's hiring in 1996. Such a claim requires proof of an employer's acceptance of services that were performed in good faith with an expectation of compensation therefor (*Landcom, Inc. v Galen-Lyons Joint Landfill Commn.*, 259 AD2d 967, 968 [1999]).

Plaintiff began helping his father at the Yankee Stadium clubhouse when he was a teenager, in the early 1980s. After then working various jobs out west for about 5½ years, supplemented with financial support from his father, plaintiff returned home around 1990. From that time forward, plaintiff would help his father in the clubhouse whenever there was a home game. His only pay for this work came from his father. (During this period, plaintiff also tried his hand at such odd jobs as gardening and painting, and a two-week stint as a department store cashier, but he was unable to make a go of any of these.) His periodic pleas to be placed on the payroll were uniformly rejected by Yankee management, until he was hired in 1996. Indeed, when plaintiff applied to the Department of Labor, immediately after his discharge, for unpaid supplemental wages, he gave no indication that he had ever worked for the Yankees prior to May 1996. Clearly, whatever services plaintiff performed prior to that date could not have been with any realistic expectation of compensation from the management defendants.

We turn now to the major allegations in this complaint: that plaintiff's dismissal was due to his sexual orientation and HIV-positive status, and that he received disparate treatment on the job based upon such predilection and condition.

The State Human Rights Law (Executive Law § 296 [1] [a]) prohibits discrimination based, inter alia, on "genetic predisposition or carrier status." Plaintiff testified that he was

diagnosed as HIV-positive in February or March of 1995, and that the team medical staff (including its orthopedic surgeon and its dentist) must have found out because "doctors do confer with each other." But there is no evidence in the record that defendants were ever aware of such a condition. The team's orthopedic surgeon (who was acquainted with and had been consulted by plaintiff) and its dentist (who actually treated plaintiff as late as September 1995) offered affidavits that they were completely unaware of any HIV condition. This cause of action should have been summarily dismissed.

Plaintiff alleges the creation—or at least toleration—of a hostile work environment in the form of harassment. He testified as to verbal and physical abuse at the hands of the individual defendants who are or were ballplayers on the team. As to the management defendants, the record is devoid of any cognizable evidence documenting or memorializing plaintiff's complaint in this regard. Despite his testimony that he complained to management "approximate[ly] 12 times, maybe 10" about these "almost daily" problems, plaintiff can point to no specific evidence that those defendants were ever formally notified of such complaints. Plaintiff testified that he had begun carrying to the clubhouse a "live" tape recorder in his pocket on a daily basis as early as 1993 or 1994, to aid him in writing a book someday, but none of these tapes was ever produced as evidence to management in support of his allegations of sexual harassment, ostensibly because he did not want to compromise his surreptitious recording of the players. Accordingly, the management defendants cannot be held vicariously liable for condoning a situation implicating nonmanagement employees, about which they were not only unaware, but had no reason to suspect (cf. *Randall v Tod-Nik Audiology*, 270 AD2d 38 [2000]; *Matter of Father Belle Community Ctr. v New York State Div. of Human Rights*, 221 AD2d 44 [1996], *lv denied* 89 NY2d 809 [1997]).

The allegation against the remaining defendants calls into consideration the New York City Human Rights Law (Administrative Code of City of NY § 8-107 [1] [a]) which—while omitting reference to genetic- or carrier-based discrimination—does otherwise generally track the state statute. In one notable exception, the Administrative Code goes a step further, making it unlawful to discriminate, in the area of employment, based upon an individual's "sexual orientation." (The catalog of prohibited acts in the State Human Rights Law did not include this element until January 2003 [L 2002, ch 2].) The New

York City Council has created a private civil right of action for persons in the City who are aggrieved by unlawful discriminatory practices (Administrative Code § 8-502). Such an ordinance cannot, of course, be inconsistent with state law (Municipal Home Rule Law § 10 [1] [i]). Defendants assert that the City ordinance expands—and thus unlawfully encroaches—upon a field preempted by the State Legislature.

In *Bracker v Cohen* (204 AD2d 115 [1994]) we held that the City Human Rights Law does not contravene the state law (at least insofar as it provides an additional penalty in the form of punitive damages), noting (at 116) that "[a]s long as a local law neither prohibits what would be permissible under State law nor imposes prerequisites or additional restrictions on rights granted under State law so as to inhibit the operation of the State's general laws, it cannot be said to be inconsistent with the State law." The Court of Appeals has declared that enactment of the State Human Rights Law has not preempted the field of antidiscrimination legislation vis-à-vis local governments (*New York State Club Assn. v City of New York*, 69 NY2d 211 [1987], *affd* 487 US 1 [1988]). Thus, it would appear that an additional cause of action for discrimination based on sexual orientation might very well be available under the local ordinance.

Plaintiff gave ample testimony, at his deposition, detailing incidents of physical and verbal harassment at the hands of the player defendants. The allegations against defendant Wickman, which appear to be the most serious, do run afoul of the one-year statute of limitations (CPLR 215 [3]; *Gallagher v Directors Guild of Am.*, 144 AD2d 261 [1988], *lv denied* 73 NY2d 708 [1989]), in that the complaint indicates his conduct continued until June 1996,[1] which was more than two years before the commencement of this action. Beyond that, the claim against all three player defendants suffers from an even more fundamental infirmity.

These defendants are mentioned only in the first cause of action, which alleges that plaintiff's "mental anguish, emotional distress and loss of enjoyment of life" stemmed solely from violations of the City and State Human Rights Laws. These laws are addressed to unlawfully discriminatory practices in the hiring, retention or firing of employees, and were not intended to target fellow employees acting without the knowledge or consent of the employer.

---

1. He would be traded from the team later that summer.

In *Murphy v ERA United Realty* (251 AD2d 469, 471 [1998]), the Second Department held as much with regard to the state statute, but went on to distinguish the City enactment (which is more important for our purposes, because it introduces the element of "sexual orientation" at issue here) by noting that the local ordinance further expands the area of liability for discriminatory practices to include an employer's "employee or agent." The Court there dismissed the cause of action against a fellow employee under the state law, but denied dismissal of a similar claim based on section 8-107 (1) (a) of the Administrative Code.

We agree with the Second Department's analysis with regard to lack of liability under the state law. In order to find a fellow employee jointly liable for an employer's discriminatory practice,[2] that coemployee must be found to possess the power to do more than simply carry out personnel decisions made by others (*Murphy v ERA United Realty, supra* at 471). But we disagree with that Court's failure to apply the same rationale to the City ordinance.

Section 8-107 (1) (a) extends liability to "an employer *or an employee or agent thereof*" (emphasis added) in substitution for the state statute's "employer *or licensing agency*" (Executive Law § 296 [1] [a] [emphasis added]). The local ordinance thus includes fellow employees under the tent of liability, but only where they act with or on behalf of the employer in hiring, firing, paying, or in administering the "terms, conditions or privileges of employment"—in other words, in some agency or supervisory capacity. There is no indication in the local ordinance, explicit or implicit, that it was intended to afford a separate right of action against any and all fellow employees based on their independent and unsanctioned contribution to a hostile environment. The inclusion of the word "employee" in the local ordinance does not automatically open the door of liability to an entirely new category of defendants; the term must be read in context.

Accordingly, the order of the Supreme Court, Bronx County (Anne Targum, J.), entered January 4, 2002, to the extent that it denied defendants' motions for summary judgment, should be reversed, on the law, without costs, and the motions granted

---

**2.** A separate cause of action against an employee for actively "aiding and abetting" discriminatory practices (Executive Law § 296 [6]; Administrative Code § 8-107 [6]), not alleged herein, would still require proof initially as to the liability of the employer (*DeWitt v Lieberman*, 48 F Supp 2d 280, 293 [SD NY 1999]).

in their entirety. The Clerk is directed to enter judgment dismissing the complaint against all defendants.

BUCKLEY, P.J., ROSENBERGER, ELLERIN and LERNER, JJ., concur.

Order, Supreme Court, Bronx County, entered January 4, 2002, reversed, on the law, without costs, and the motions granted in their entirety. The Clerk is directed to enter judgment dismissing the complaint against all defendants.