OPINION OF THE COURT
Rolando T. Acosta, J.
Background
On February 6, 2003, plaintiff Thomas Farrugia, a white male lab technologist at North Shore University Hospital, filed a complaint alleging sexual harassment, sexual discrimination, and national origin discrimination under both the New York State and New York City Human Rights laws. The crux of his complaint is that he has been sexually harassed by a female lab technologist and that the hospital has refused to do anything about it. He also alleges that the majority of lab technologists and supervisors are Asian-Filipino and that they, with the hospital’s consent, have discriminated against him because of his national origin. Given the three-year statute of limitations (CPLR 214 [2]; Executive Law § 297 [9]; Administrative Code of *742 City of NY § 8-502 [d]), plaintiffs allegations are presented pre- and post-February 6, 2000.
Pre-February 6, 2000 Allegations
Plaintiff was hired by defendant North Shore Hospital on January 11, 1993 as a lab technologist. According to plaintiff, in 1995 another lab technologist, Annabelle Joson, said to plaintiff on consecutive nights, “oh, you look like you just had sex.” Plaintiff reported the first incident to Hydie Cheng, the lead technologist on the shift, right away and the second incident shortly thereafter. Cheng allegedly said that she would look into it and Joson never made that comment to him again. In 1996, Joson also allegedly pulled the elastic on her pants down and said “you should see what is underneath.” Plaintiff did not report this incident to anyone. Also, in two separate incidents in 1996, Joson allegedly exposed her buttocks to plaintiff, and he complained to Cheng. In addition, in February 1996, plaintiff observed Joson rub her breast against another woman and then motioned to plaintiff as if to say, “we can have any man that we want.”
In January 2000, plaintiff was transferred to the 4:00 p.m. to 12:00 a.m. shift. During this time, Joson allegedly commented on plaintiffs appearance, at times looking at him up and down, saying that he “looked good” and “you are such a good dresser.” On one occasion she said, “Look, you have a receding forehead” and “what does it feel like to have a receding forehead.” Plaintiff asked her to leave him alone, but she allegedly persisted and would call him “selfish and cold-hearted.” She would also tell other workers that plaintiff did not like women. Joson would engage in conversation with her coworkers in a language that plaintiff did not understand, but his name would be referenced in the middle of the conversation. According to plaintiff, Joson would subject him to these comments three to four times a week. At one time, plaintiff told Joson that he had a medical condition with his veins in his scrotum, and she referred to him as a “broken arrow.”
Post-February 6, 2000 Allegations
In addition to the alleged inappropriate comments by Joson being made three to four times a week, in late May or early June 2000 Joson rubbed plaintiffs waist with her arm as he was holding a blood sample in his hands, while she made a gesture as if she were holding his genitals. Plaintiff told her to get her hands off and allegedly reported the incident to Cheng, who told him that Joson simply had a crush on him.
*743 During this time period, Joicie Garcia, another lab technologist, bent over and simulated a sex act when plaintiff asked her “what have you been up to[?]” Plaintiff did not report this incident.
Plaintiffs Performance Evaluation
On June 8, 2000, plaintiff was evaluated by Joyceann Musel-Winn, administrative director of the laboratory department. Although plaintiffs overall score was a 3 (“Meets Standards— that behavior which consistently meets the expected performance level with minimal errors”) on a scale of 1 to 5 (32 categories), he received a total of six scores of “[n]eeds some improvement” and one “[d]oes not meet standard” for his inability to get along with his coworkers. He also received an “unsatisfactory” for attendance given his 20 absences and 31 instances of tardiness for the year. Musel-Winn nonetheless marked the “[rjetain employee in present position” recommendation.
According to Musel-Winn, plaintiff became upset about his low scores and stated that “[t]his is par for a lab with its staffing, with all the females in the lab” and that he had told her about it before. Musel-Winn responded that she did not recall having any conversations with him about the women in the lab, to which he stated, according to Musel-Winn, for the first time that he was “tired of the sexual harassment in the laboratory, all the innuendos that go on in the laboratory concerning” him because he was the only male on the evening shift. He also allegedly told her that “that woman, she is always after me. She is always looking at me and laughing. She must like me and I don’t want to deal with her. Tell her to stop.” According to Musel-Winn, plaintiff did not identify the person allegedly harassing him.
When Musel-Winn asked Cheng about plaintiffs allegations, Cheng denied that she had engaged in any inappropriate behavior and stated that she did everything possible to stay away from plaintiff because he was dangerous. In support of her concern, she stated that plaintiff brought a hammer and a knife to work in a bag and made a point of banging the bag on the tables in the lab when he was angry. In fact, plaintiff admitted that he started bringing a hammer and knife to work during a strike in 1996 because he feared for his life. Musel-Winn also spoke with other lab employees who denied any sexual harassment or that they saw anyone harass plaintiff.
Musel-Winn also stated that on June 15, 2000 plaintiff was visibly upset and pacing back and forth while muttering about *744 Joson. He complained to Musel-Winn that Joson had on shorts underneath her lab coat. Musel-Winn looked into it and determined that Joson had on a skirt. She nonetheless asked both plaintiff and Joson to come into her office. When they came in, according to Musel-Winn, plaintiff for the first time alleged that he had been sexually harassed by Joson. Plaintiff told her that Joson tried to impress him by pulling down her underwear, made sexual remarks concerning his sexual organ, including remarking about the size of his penis, and stared at his crotch. At his deposition, however, plaintiff stated that he told Musel-Winn about Joson’s conduct at the June 8 evaluation. (Plaintiffs deposition at 133.) When asked whether that was the first time that he complained about Joson’s behavior, he stated “I believe I told her in the past as well.” (Id.)
Joson denied plaintiff’s allegations, and like Cheng, stated that she was afraid of plaintiff because he hit the lab walls with his fist when he was angry, carried a hammer in his bag, and banged his bag on the tables when he was angry so that it was obvious that he had a hammer in his bag. According to Musel-Winn, her investigation revealed that it was plaintiff who was interested in Joson. She also spoke with Joicie Garcia who denied plaintiffs allegation about her. Garcia told Musel-Winn that plaintiff was interested in Joson and had talked to Garcia about Joson’s “pretty legs” and that he wanted to have sex with Joson.
On June 16, 2000, the day after plaintiff complained to Musel-Winn about Joson, plaintiff spilled a urine sample on Joson. According to Musel-Winn, the circumstances suggested that it was intentional and she reported the incident in a hospital safety committee meeting. About one month later, Garcia sent Musel-Winn a letter detailing plaintiff’s sexually harassing behavior toward both she and Joson. Joson also reported to Musel-Winn that after Garcia had rebuffed plaintiffs sexual advances, he approached Joson and asked her whether Garcia was dating an “Indian doctor” and whether they “have big penises.”
Plaintiffs Termination
According to Musel-Winn, plaintiff had a history of behavioral and performance problems. He had been warned about his attendance problems in his 1994, 1996, 1998, and 2000 performance evaluations. Indeed, on December 30, 1999, he received a disciplinary warning because he failed to show up for his shift, called and said that he had overslept, and then never reported for duty that night. On February 14, 2000, he was disciplined *745 for insubordination for “scratching out” his weekend shift from the schedule. Musel-Winn warned him that he could not alter hospital records and told him that she expected him to work on his assigned shifts. Despite the warning, he called in sick on the days he had scratched off.
He also, according to Musel-Winn, repeatedly failed to follow critical lab protocol. For instance, in 1999, he made four critical errors, including botching up a pregnancy test, filing a false negative, and after determining that the test was positive, failing to notify the emergency room that he changed the results. He had also been warned about not documenting critical value calls (test results that must be reported immediately) on July 22, 1999, August 8, 1999, March 10, 2000, and July 6, 2000.
On July 17 and August 3, 2000, plaintiff committed two “critical” errors in the lab by not following hospital protocol. As a result of his errors, he filed lab results which had not been properly verified and on which hospital staff could have relied in making treatment decisions. According to Musel-Winn, given plaintiffs past behavioral and performance issues, she decided to terminate him.
Plaintiffs Complaint
On November 14, 2000, plaintiff filed a complaint with the New York State Division of Human Rights (NYSDHR), alleging that he was discriminated against due to his “race/color” and “national origin,” and “retaliated against . . . because he complained of discrimination.” Plaintiff subsequently annulled his election of the administrative process prior to a hearing and filed a complaint in Supreme Court. His complaint alleges six causes of action. The first two allege that defendant violated the New York State Human Rights Law (first) and New York City Human Rights Law (second) “by sexually harassing [p]laintiff, discriminating against him because of his sex and firing [p]laintiff in response to his complaints about harassment.” The third and fourth alleged that defendant violated the New York City Human Rights Law (third) and the New York State Human Rights Law (fourth) “by harassing [p]laintiff based on his American national origin, and firing [p]laintiff in retaliation for his complaints.” Last, the fifth and sixth allege that defendant violated the New York State Human Rights Law (fifth) and New York City Human Rights Law (sixth) “by firing [p]laintiff because of his complaints about sexual harassment and national origin discrimination.”
*746 Analysis
While a complainant may annul his election to the administrative process at the NYSDHR prior to a hearing and then proceed to court (Executive Law § 297 [9]; Whidbee v Garzarelli Food Specialties, Inc., 223 F3d 62, 75-76 [2d Cir 2000]; Legg v Eastman Kodak Co., 248 AD2d 936, 937 [4th Dept 1998]), if such annulment is made, any judicial proceedings are subject to New York’s general three-year statute of limitations, measured from the occurrence of the discrimination, with no tolling for the period in which the claim was pending in the administrative process. (Executive Law § 297 [9]; Henderson v Town of Van Buren, 15 AD3d 980 [4th Dept 2005]; Sprott v New York City Hous. Auth., 1999 WL 1206678, 1999 US Dist LEXIS 19224 [SD NY, Dec. 16, 1999].) The three-year statute of limitations, however, will not prevent the court from going beyond the limitations period in hostile environment claims if the conduct is of a continuous nature. (National Railroad Passenger Corporation v Morgan, 536 US 101 [2002]; Hernandez v Kellwood Co., 2003 WL 22309326, 2003 US Dist LEXIS 17862 [SD NY, Oct. 8, 2003] [continuing violation analysis applied to federal discrimination claims under New York City Human Rights Law]; Hughes v United Parcel Serv., Inc., 4 Misc 3d 1023[A], 2004 NY Slip Op 51008[U] [Sup Ct, NY County 2004].) As the Supreme Court in National Railroad Passenger Corporation v Morgan (536 US at 117) held:
“A hostile work environment claim is composed of a series of separate acts that collectively constitute one ‘unlawful employment practice.’ The timely filing provision only requires that a . . . plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.” (Citation omitted.)
The Supreme Court, however, held that acts occurring outside the statutory period that “had no relation to the acts [within the statutory period], or for some other reason, such as certain intervening action by the employer, [were] no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts.” (Id. at 118 [emphasis added].)
*747 Here, plaintiff annulled, his election to pursue the administrative process pursuant to the State Human Rights Law and filed a complaint in the Supreme Court on February 6, 2003. Given the three-year statute of limitations, only conduct occurring on February 6, 2000 or later can be used to support his claim of discrimination, unless the continuing doctrine applies. As discussed below, this court finds that the continuing discrimination doctrine applies only to the alleged sexual harassment conduct attributed to Joson as of January 2000 (i.e., when plaintiff was transferred to the 4:00 p.m. to 12:00 a.m. shift).
Sexual Harassment — Hostile Work Environment
The New York City Human Rights Law was intended to be more protective than the state and federal counterparts. As this court recently stated in Jordan v Bates Adv. Holdings, Inc. (11 Misc 3d 764, 770-771 [Sup Ct, NY County 2006]),
“[I]n enacting the more protective Human Rights Law, the New York City Council has exercised a clear policy choice which this court is bound to honor. The Administrative Code’s legislative history clearly contemplates that the New York City Human Rights Law be liberally and independently construed with the aim of making it the most progressive in the nation.[1] Thus, the case law that has developed in interpreting both the state Human Rights Law and title VII of the Civil Rights Act of 1964 should merely serve as a base for the New York City Human Rights Law, not its ceiling. (See also Local Law No. 85 [2005] of City of New York § 1 [Local Civil Rights Restoration Act of 2005]; Council Report of *748 Governmental Affairs Div, Comm on General Welfare, Aug. 17, 2005.)”[2]
To establish a claim of sexual harassment under the City Human Rights Law, plaintiff must show that (1) he belongs to a protected group; (2) he was subjected to unwelcome sexual harassment; and (3) the harassment complained of was based upon his sex. Although under the federal and New York State counterparts plaintiff must also show that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment (see, e.g. Harris v Forklift Systems, Inc., 510 US 17, 21 [1993];[3] Tomka v Seiler Corp., 66 F3d 1295, 1305 [2d Cir 1995]; Cosgrove v Sears, Roebuck & Co., 9 F3d 1033, 1042 [2d Cir 1993]; see also Judith Johnson, License to Harass Women: Requiring Hostile Environment Sexual Harassment to be “Severe or Pervasive” Discriminates Among “Terms and Conditions” of Employment, 62 Md L Rev 85 [2003]), such a construct is inconsistent with the City’s Human Rights Law. Under the City’s law, liability should be determined by the existence of unequal treatment, and ques *749 tions of severity and frequency reserved for consideration of damages. (A Return to Eyes on the Prize at 297-303.)
Under both the State’s and the City’s Human Rights laws, an employer is liable for the conduct of a nonmanagement employee or agent if it knew or should have known of the conduct and failed to prevent it. (Priore v New York Yankees, 307 AD2d 67 [1st Dept 2003]; Administrative Code § 8-107 [13] [a], [b].)
It is well settled that the proponent of a motion for summary judgment must establish that “there is no defense to the cause of action or that the cause of action or defense has no merit” (CPLR 3212 [b]) sufficiently to warrant the court as a matter of law to direct judgment in his or her favor. (Bush v St. Clare’s Hosp., 82 NY2d 738, 739 [1993]; Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853 [1985].) This standard requires that the proponent of the motion “tender[ ] sufficient evidence to eliminate any material issues of fact from the case” (Winegrad at 853), “by evidentiary proof in admissible form.” (Zuckerman v City of New York, 49 NY2d 557, 562 [1980].) Thus, the motion must be supported “by affidavit [from a person having knowledge of the facts], by a copy of the pleadings and by other available proof, such as depositions.” (CPLR 3212 [b].)
Where the proponent of the motion makes a prima facie showing of entitlement to summary judgment, the burden shifts to the party opposing the motion to demonstrate by admissible evidence the existence of a factual issue requiring a trial of the action, or to tender an acceptable excuse for his or her failure to do so. (Vermette v Kenworth Truck Co., 68 NY2d 714, 717 [1986]; Zuckerman v City of New York, 49 NY2d at 560, 562, supra.) Like the proponent of the motion, the party opposing the motion must set forth evidentiary proof in admissible form in support of his or her claim that material triable issues of fact exist. (Zuckerman at 562.)
Here, viewing the facts in the light most favorable to plaintiff (Kesselman v Lever House Rest., 29 AD3d 302 [1st Dept 2006]), plaintiff has certainly alleged sufficient facts, especially those attributed to Joson, to make out a claim of sexual harassment. Moreover, defendant asserts that he told Cheng, the lead technologist, that Joson had rubbed her arm against plaintiffs waist, and she failed to take any action. Defendant has thus failed to establish entitlement to summary judgment dismissing plaintiffs sexual harassment claims. Indeed, the conduct al *750 leged in this case satisfies even the state standard, which requires a showing that the harassment was severe and pervasive. Even if defendant had established its prima facie right to summary judgment, the court nevertheless finds triable issues of fact on this claim. (Gallagher v Delaney, 139 F3d 338, 342 [2d Cir 1998] [“while gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting, a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment”].)
The more difficult issue here is whether plaintiff may rely on Joson’s alleged conduct that predates February 6, 2000. According to plaintiff, Joson began her offensive conduct as early as 1995, but that conduct stopped in 1996. According to plaintiff, he complained to Cheng when Joson told him that “he looked like he had just had sex,” and the conduct ceased. The offensive conduct, according to plaintiff, did not start up again until sometime in January 2000, when he was transferred to a new shift. Then, Joson allegedly made offensive remarks on average of three to four times a week. The January 2000 acts are sufficiently similar and frequent to justify a conclusion that they are part of a single discriminatory practice chargeable to the employer.
The 1996 and earlier remarks attributed to Joson, however, do not satisfy the continuing discrimination doctrine because it cannot be said that defendant allowed the earlier comments to continue unremedied. (National Railroad Passenger Corporation v Morgan, 536 US at 119.) Indeed, plaintiff complained to Cheng and the conduct ceased in 1996. Accordingly, defendant’s motion for summary judgment dismissing the sexual harassment and hostile work environment causes of action is granted solely to the extent of precluding plaintiff from using pre-January 2000 allegations to support his claim at trial.
National Origin and Gender Discrimination Claims
In the absence of direct evidence of national origin or gender discrimination, claims are evaluated pursuant to the burden-shifting framework outlined by the United States Supreme Court in McDonnell Douglas Corp. v Green (411 US 792 [1973]). (Terry v Ashcroft, 336 F3d 128, 138 [2d Cir 2003].) Thus, a party making such a claim must first make out a prima facie case by demonstrating that he is a member of a protected class *751 and was discharged or barred from a position for which he was qualified, or paid less in such position, and that this occurred under circumstances giving rise to an inference of discrimination. (McDonnell Douglas Corp. at 802.) All that is required at this juncture is a de minimis showing. (Howley v Town of Stratford, 217 F3d 141, 150 [2d Cir 2000].)
Once a prima facie case has been established, a presumption arises that the employer unlawfully discriminated against the plaintiff. (Texas Dept. of Community Affairs v Burdine, 450 US 248, 254-256 [1981].) To rebut the presumption, the employer must submit evidence of legitimate, nondiscriminatory reasons for its adverse actions toward plaintiff. (Id.; Stratton v Department for the Aging, 132 F3d 869 [2d Cir 1997].) If evidence rebuts the presumption of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer’s reason was false and that discrimination was the real reason. (Stephenson v Hotel Empls. & Rest. Empls. Union Local 100 of AFL-CIO, 14 AD3d 325, 330 [1st Dept 2005], citing Ferrante v American Lung Assn., 90 NY2d 623, 630 [1997].)
“The factfinder’s disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant’s proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.” (St. Mary’s Honor Center v Hicks, 509 US 502, 511 [1993].)
Here, defendant has established its entitlement to summary judgment dismissing the gender discrimination claim inasmuch as there is no indication in the record that plaintiff was discriminated against because of his gender. The burden thus shifted to plaintiff to raise triable issues of fact, which he has failed to do.
Defendant has also established its entitlement to summary judgment dismissing the national origin discrimination claim. Plaintiff grounds this claim on three arguments: that his shift was taken from him in 1994 and given to a Filipino; that overtime was assigned disproportionately to Filipino coworkers; and that he was not given the benefit of defendant’s progressive discipline plan. The 1994 shift change, however, is time-barred under the three-year statute of limi *752 tations. With respect to the overtime issue, there is no evidence in admissible form to support plaintiff’s allegation. Although he attached Joson’s records showing the amount of overtime she received, there is no evidence that this amount is greater than what anyone else received. Plaintiff also attempts to support his claim with inadmissible hearsay evidence. Last, plaintiffs claim that defendant did not employ its progressive disciplinary procedure is not supported by the facts. Instead, the record shows that the collective bargaining agreement provides that defendant “shall have the right to discharge, suspend, or discipline any [e]mployee for cause.” (Defendant’s exhibit I.) In any event, the record shows that plaintiff received both verbal and written warnings as well as suspension before he was terminated. (See defendant’s exhibit H.) Plaintiff’s failure to raise triable issues of fact related to national origin discrimination necessitates the dismissal of this cause of action as well.
Retaliation Claims
To establish a retaliation claim, a plaintiff must make out a prima facie case that: (1) he participated in a protected activity known to the defendant; (2) the defendant took an employment action that disadvantaged the plaintiff; and (3) a causal connection exists between the protected activity and the adverse employment action. (Terry v Ashcroft, 336 F3d at 141, supra; McMenemy v City of Rochester, 241 F3d 279, 282-283 n 1 [2d Cir 2001]; Holt v KMI-Continental, Inc., 95 F3d 123 [2d Cir 1996].) Unlike the federal standard which requires that the manifestations of retaliation be material, under the City’s Human Rights Law, the 1991 amendment made it clear that it was illegal to retaliate “in any manner.” (A Return to Eyes on the Prize at 321, quoting Local Law No. 39 [1991] of City of New York, amending Administrative Code § 8-107 [7].)[4]
Here, plaintiff claims that all three prongs were satisfied because he received an evaluation in June 2000, which stated that he should be retained. Second, two months later, he was *753 terminated for infractions that predated his evaluation. Third, a rational jury could conclude that a causal connection existed between plaintiffs complaints of sexual harassment to Musel-Winn (the protected activity) and his termination (the adverse employment action). The problem with this argument is that although plaintiff received a “retain employee” evaluation, Musel-Winn had indicated in the evaluation several categories which needed improvement. Moreover, as demonstrated by defendant’s exhibit H, plaintiff had received many warnings prior to his termination. Third, defendant conducted an investigation into plaintiffs claims of sexual harassment by questioning the relevant parties. It should be noted that the day after plaintiff complained about Joson, plaintiff spilled a urine sample on her under circumstances indicating that it was intentional. Thus, plaintiff cannot show that defendant terminated him because of his complaints. (Taylor v Polygram Records, 1999 WL 124456, *21, 1999 US Dist LEXIS 2583, *61 [SD NY, Mar. 8, 1999] [“(g)iven that (plaintiffs) position was already demonstrably at risk before she . . . filed the charge, (p)laintiff cannot show on the basis of temporal proximity alone that her termination resulted from that conduct”]; Padob v Entex Info. Serv., 960 F Supp 806, 814 [SD NY 1997] [finding that plaintiff who was terminated three months after filing an EEOC charge did not establish causal connections, given that plaintiff had been placed on a “performance improvement plan” before filing the charge].) Moreover, after the evaluation, plaintiff not only spilled urine on Joson, but also breached critical hospital testing procedures on two occasions. Thus, the retaliation claims must also be dismissed.
Conclusion
For the reasons stated above, it is ordered that defendant’s motion for summary judgment dismissing the complaint is granted solely to the extent of dismissing that portion of the first and second causes of action that allege discrimination against plaintiff because of his sex[5] and firing plaintiff in response to his complaints about sexual harassment. Although the portions of the first and second causes of action that allege sexual harassment survive summary judgment, plaintiff may *754 not rely on alleged sexual harassment conduct that predates January 2000 in support of his claims; and it is further ordered that the third, fourth, fifth and sixth causes of action are also dismissed.
[Portions of opinion omitted for purposes of publication.]

. “(Remarks by former Mayor David N. Dinkins at a public hearing on Local Laws of the City of New York, June 18, 1991, at 1-2 [on file with Committee on General Welfare].) As former Mayor Dinkins noted, it was ‘the intention of the Council that judges interpreting the City’s Human Rights Law . . . not ... be bound by restrictive state and federal rulings and are to take seriously the requirement that this law be liberally and independently construed.’ (Id. at 1; see also Local Law No. 85 [2005] of City of NY § 1 [Local Civil Rights Restoration Act of 2005] [‘It is the sense of the Council that New York City’s Human Rights Law has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law. In particular, through passage of this local law, the Council seeks to underscore that the provisions of New York City’s Human Rights Law are to be construed independently from similar or identical provisions of New York state or federal statutes. Interpretations of New York state or federal statutes with similar wording may be used to aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City’s Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise’].)” (11 Misc 3d at 770 n 1.)

. Indeed, Professor Craig Gurian, the principal drafter of the Local Civil Rights Restoration Act in 1991, argues that the courts’ unwillingness to apply a more liberal standard in construing the City’s Human Rights Law led to the passage of the Restoration Act in 2005 (Local Law No. 85 [2005] of City of New York [eff Oct. 3, 2005]). (Craig Gurian, A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law, 33 Fordham Urb LJ 255 [2006].) According to Gurian,
“The Restoration Act requires that provisions of the City’s Human Rights Law hereafter be construed liberally to accomplish the ‘uniquely broad and remedial’ purposes of the local law, ‘regardless of whether federal or New York State . . . human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed.’ ” (Id. at 275, quoting Local Law No. 85 [2005] of City of New York § 7, amending Administrative Code § 8-130.)
The existing case law should be used only as an aid in interpreting the City Human Rights Law in one of two ways: the first, “as a floor below which the City’s Human Rights Law cannot fall, rather than a ceiling above which the local law cannot rise.” (Id. at 278, quoting Local Law No. 85 [2005] of City of New York § 1), and the second “to find the construction that best accomplishes the law’s purposes.” (Id. at 279.)

. In Harris, the Supreme Court stated that
“whether an environment is ‘hostile’ or ‘abusive’ can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” (Id. at 23.)

. Indeed, concerned with courts applying the federal materiality standard, the Restoration Act sought to remedy this by adopting the standard set out in guidelines of the Equal Employment Opportunity Commission (EEOC). (A Return to Eyes on the Prize at 320, citing Council Report of Governmental Affairs Div, Comm on General Welfare, Aug. 17, 2005, at 3.) Under the EEOC guidelines, the “ ‘degree of harm suffered by the individual “goes to the issue of damages, not liability.” ’ ” (A Return to Eyes on the Prize at 320, quoting 2 EEOC Compliance Manual § 8, at 8-13 [1998].)

. Although “sex-based discrimination in employment has come to include sexual harassment” (Matter of Father Belle Community Ctr. v New York State Div. of Human Rights, 221 AD2d 44, 49 [4th Dept 1996]), only the sexual harassment portion of the sex discrimination alleged in the first and second causes of action survives summary judgment.