Jannie PILGRIM, Giovanna Henson,
Jesan Spencer, and Brenda
Curtis, Plaintiffs,

v.

The McGRAW–HILL COMPANIES,
INC., Defendant.

No. 07 Civ. 6618(CM)(AJP).

United States District Court,
S.D. New York.

Feb. 18, 2009.

Lawrence Solotoff, Solotoff & Solotoff, Great Neck, NY, for Plaintiffs.

Elise Michelle Bloom, Nathaniel M. Glasser, Steven D. Hurd, Proskauer Rose LLP (New York), Gregory I. Rasin, Jackson Lewis LLP (NYC), New York, NY, for Defendant.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMAHON, District Judge:

### Introduction

Plaintiffs Jannie Pilgrim ("Pilgrim"), Giovanna Henson ("Henson"), Brenda Curtis ("Curtis"), and Jesan Spencer ("Spencer")—all of whom are African–American—bring this action against their former employer The McGraw–Hill Companies, Inc. ("McGraw–Hill" or "the company"), claiming that it discriminated against them based on their race, and retaliated against them for complaining about race discrimination at the company.

McGraw–Hill is a worldwide corporation engaged in publishing and information services with its headquarters located in New York City. (Def. Rule 56.1 ¶ 5.) It is divided into three operating segments: (1) McGraw–Hill Education ("MHE"); (2) Financial Services, which includes Standard & Poor's ("S & P"); and (3) Information and Media Services ("IMS"). (*Id.* ¶ 6.) These operating segments receive support services from a corporate segment, which includes the Human Resources Department ("HR"). (*Id.* ¶ 7.)

On or about December 16, 2005—while still working at McGraw–Hill—the plaintiffs filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about May 21, 2007, the EEOC issued notices of right to sue to each plaintiff. (Def. Rule 56.1 ¶ 2.) Together, they brought this action by

jointly filing a complaint before this Court on July 23, 2007.

Henson, Curtis, and Spencer (collectively, "plaintiffs")[1] bring employment discrimination claims under Title VII, 42 U.S.C. § 1981 ("section 1981"), the New York State Human Rights Law (hereinafter, "HRL"), and New York City Human Rights Law (hereinafter, "CHRL"). Under these statutes, all three of them bring causes of action against McGraw–Hill for race discrimination.

Henson, Curtis, and Spencer contend that McGraw–Hill retaliated against them, in violation of Title VII, section 1981, the HRL and the CHRL.

Henson contends that McGraw–Hill failed to promote her in retaliation for her complaints about race discrimination.

Curtis contends that McGraw–Hill did not re-hire her for new positions at the company, after she left it, in retaliation for her complaints about race discrimination while she worked at McGraw–Hill.

Spencer contends that McGraw–Hill retaliated against her for complaining about race discrimination and filing an EEOC charge. In response to her complaints of race discrimination, she argues that McGraw–Hill transferred her to a different division and reduced her job responsibilities.

In addition to retaliation claims, Spencer—and only Spencer—brings causes of action for hostile work environment and constructive discharge under Title VII, section 1981, the HRL, and the CHRL. She contends that her supervisor's conduct created a hostile work environment. As a result of her complaints about his conduct, she argues that McGraw–Hill tried to force her out of the company.

Defendant moves for summary judgment on each of the claims brought by the plaintiffs.

For the reasons set forth below, defendant's motion for summary judgment is granted in part and denied in part.

## I. Standard of Review

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In addressing a motion for summary judgment, "the court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in [its] favor." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 60 (2d Cir.1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must present "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case.

---

1. Plaintiff Pilgrim's claims are not discussed in this opinion because defendant's summary judgment motion does not address them.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Finally, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant.

## II. Standard for Employment Discrimination

■ As an initial matter, the standard for all Title VII, section 1981, HRL and CHRL employment discrimination claims is the same, *see Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 n. 1 (2d Cir.2000) (noting the standard for HRL and CHRL is the same as Title VII); *Gant v. Wallingford Bd. Of Educ.*, 195 F.3d 134, 146 (2d Cir. 1999) (noting the same for section 1981), except for retaliation claims under the CHRL, which is explained below in Part II.B.

### A. Race Discrimination

In discrimination cases, the plaintiff bears the burden of introducing evidence that would, if credited, establish every element of his *prima facie* case. The plaintiff must show "1) that be belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir.2004). In the context of discriminatory hiring, the plaintiff's *prima facie* case requires that he show (i) that he belonged to a protected class; "(ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). If the plaintiff meets that minimal burden, the defendant must come forward with a legitimate non-discriminatory reason for taking the action it took. At that point, the burden shifts back to the plaintiff to prove, with evidence and not conclusory supposition, that the defendant's articulated rationale is a pretext for discrimination. *Id.* at 806, 93 S.Ct. 1817. The plaintiff, with admissible evidence, "must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Feingold*, 366 F.3d at 152.

### B. Retaliation

To establish a *prima facie* case of retaliation, a plaintiff must show that: 1) he was engaged in a protected activity; 2) his employer was aware of that activity; 3) he suffered a materially adverse action; and 4) there was a causal connection between the protected activity and the adverse employment action. *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); *Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997) (applying the same standard to HRL claims); *Pugni v. Reader's Digest Ass'n, Inc.*, 05 Civ. 8026, 2007 WL 1087183 at *22 n. 6 (S.D.N.Y. Apr. 9, 2007) (same). If the plaintiff meets this burden, the *McDonnell Douglas* burden-shifting analysis used in claims of discrimination—articulated above—also applies to retaliation claims. *Bush v. Fordham Univ.*, 452

F.Supp.2d 394, 415 (S.D.N.Y.2006) (citing *Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir.2003)).

■ The *prima facie* standard for retaliation claims under the CHRL is different, in that there is no the requirement that the employee suffer a materially adverse action. Instead, the CHRL makes clear that it is illegal for an employer to retaliate in "any manner." *Selmanovic v. NYSE Group, Inc.*, 06 civ. 3046, 2007 WL 4563431 at *5 (S.D.N.Y. Dec. 21, 2007); *Sorrenti v. City of New York*, No. 113037/02, 17 Misc.3d 1102(A), 2007 WL 2772308 at *4 (N.Y.Sup.Ct. Aug. 16, 2007) (unreported); *Farrugia v. North Shore Univ. Hosp.*, 13 Misc.3d 740, 820 N.Y.S.2d 718, 727 (N.Y.Sup.Ct.2006). The relevant provision states:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies *to retaliate or discriminate in any manner against any person because such person has* (i) *opposed any practice forbidden under this chapter,* (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8–115 of this chapter. *The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment,* housing or a public accommodation *or in a materially adverse change in the terms and conditions of employment,* housing, or a public accommodation, *provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity.*

N.Y.C. Admin. Code § 8–107(7) (emphasis added). Thus, under the CHRL a plaintiff must show: 1) he engaged in a protected activity; 2) his employer was aware of that activity; 3) he suffered an action that would be reasonably likely to deter a person from engaging in a protected activity; and 4) that there was a causal connection between the protected activity and the action. If relevant, the *McDonnell Douglas* burden-shifting analysis also applies.

## III. Henson

### A. Background

Plaintiff Henson is an African–American woman who began her employment with McGraw–Hill on or about June 16, 1997. (Pl. Rule 56.1 ¶ 180; Def. Rule 56.1 ¶ 13.) Initially, Henson worked at the JJ Kenny Division of S & P as a Research Associate. (*See* Def. Rule 56.1 ¶ 15.) Her starting annual salary was $26,000, and her position was a grade level 11. (*Id.* ¶ 14.) She worked in this position for over three years. (*See id.* ¶ 15.) During this time period, she received several promotions and salary increases. (*Id.*) Henson's last position at S & P was Senior Research Associate, where she was a grade level 13 with an annual salary of $35,000. (*Id.* ¶ 17.)

On or about March 20, 2001, Henson applied for and received a promotion to the position of HR Coordinator. (Def. Rule 56.1 ¶ 18; Pl. Rule 56.1 ¶ 180.) This promotion was considered an "in-grade" promotion, which meant that her grade level remained at its prior level, 13. (Def. Rule 56.1 ¶ 19.)

In this new position, Henson initially reported to Dina Parello ("Parello"), HR Director, and Sheila O'Neill ("O'Neill"),

Vice President of HR. (*Id.* ¶ 20.) After seven to eight months, Henson stopped reporting to Parello; O'Neill became Henson's direct supervisor, and Henson also reported to Ivy Latimer ("Latimer"), Director of EEO and Diversity Initiatives, on diversity issues. (Solotoff Decl. Henson Tr. at 40:9–19 (hereinafter, "Henson Tr. A."); Def. Rule 56.1 ¶ 22.)

Henson worked as a HR Coordinator for approximately four and a half years. (Henson Tr. A. at 33:11–14.) Her responsibilities in this job, which grew over time, included, *inter alia*: providing support services to Parello, O'Neill, Latimer, and Cherise Little ("Little"), HR Representative; scheduling interviews for job applicants; conducting new hire orientation; compiling new hire materials and packets; assisting O'Neill in employee and manager training by setting-up Power Point presentations; conducting Performance Management Program training for managers who were learning how to use the program; organizing "Take Our Daughters and Sons to Work Day"; compiling information for Affirmative Action Plans and Diversity Reports; and maintaining O'Neill, Parello, and Latimer's schedules. (Henson Tr. A. at 40:20–48:23; Def. Rule 56.1 ¶ 22.)

From 2001 to 2003, Henson, as a HR Coordinator, received overall performance ratings of "performance achieved expectations" on her annual performance reviews. (Def. Rule 56.1 ¶ 24.) O'Neill, who was Henson's direct report, reviewed Henson's performance and completed her annual performance evaluations. (*Id.* ¶ 23.)

In 2004, McGraw–Hill changed its performance appraisal system and implemented the "Performance Management Process" ("PMP"). (*Id.* ¶ 25.) Under this new system, Henson received an overall rating of "fully meets performance standards" on an unsigned—and therefore purportedly uncompleted—PMP. (Rasin Decl. Ex. Q at D00163; Def. Rule 56.1 ¶ 26; Pl. Rule 56.1 ¶ 26.)

Under the new appraisal system, a rating of "fully meets performance standards" is the same as the rating "performance achieved expectations" that Henson received on her prior reviews. (Def. Rule 56.1 ¶ 27; Pl. Rule 56.1 ¶ 27.)

Even though Henson's performance as a HR Coordinator was satisfactory, there were aspects of her performance that purportedly needed to be improved. For example, her 2003 evaluation noted, "Giovanna [Henson] has struggled this year with a heavy work load that often leads to tension between herself and other members of the department when she is feeling overwhelmed by competing demands. She has received constructive feedback about how her behavior ... contributes to the impression of her being unwilling or uncooperative with certain tasks." (Rasin Decl. Ex. Q at D00134.)

In February 2005, McGraw–Hill contends that O'Neill gave Henson a verbal warning about her performance. Among other things, Henson was told that she continued to display deficient interpersonal and communications skills. (*See* Def. Rule 56.1 ¶ 30.) As evidence that a verbal warning was given, McGraw–Hill offers O'Neill's notes from the meeting with Henson, which purportedly capture what O'Neill told her at the meeting. (Rasin Decl. Ex. R.) Henson disputes that a verbal warning was given, and asserts that O'Neill's notes were created after January 18, 2005, which is the date that Henson complained to O'Neill about racism at McGraw–Hill (see below). (Pl. Rule 56.1 ¶ 30.)

While Henson worked as a HR Coordinator, she applied for a number of other positions at McGraw–Hill from 2003 to 2005. (Def. Rule 56.1 ¶ 31.) Henson con-

tends that she applied for a position as a: (1) Talent Acquisition Specialist in or about June 2003; (2) HR Representative at IMS in or about September 2003; (3) HR Representative at MHE between October and December 2003; (4) Recruiting Specialist Campus Recruiting at S & P (hereinafter, "RSC") in or about November 2004; and (5) HR Representative at S & P (hereinafter, "HR Rep") in or about June 2005. (*Id.*)

Henson contends that she was denied promotions at McGraw–Hill repeatedly because of racism and unfair treatment, and claims she told O'Neill, her supervisor, about this problem, "all the time." (*See* Pl. Rule 56.1 ¶ 233.)

For example, on or about January 18, 2005,[2] Henson complained to O'Neill that she did not get the RSC promotion because she was African–American. (*Id.* ¶¶ 234, 235.) Henson told O'Neill, "You do not know what it is like being African American at McGraw–Hill." (*Id.* ¶ 235.) Henson claims O'Neill responded by saying, "She did not know what it is like being African American at McGraw–Hill." (*Id.* ¶ 54.) O'Neill claims she said, "Yes, that's right. I don't know what it's like being black." (Rasin Decl. Ex. G at 150:5–7 (hereinafter, "O'Neill Tr. A.").)[3] Henson contends that O'Neill's comments were "offensive, humiliating and inappropriate coming from the Vice President of Human Resources." (Pl. Rule 56.1 ¶ 54.)

The significance of the purported difference about what O'Neill said in response to Henson's complaint is based on the context of the comments, which the parties dispute. Henson maintains that the January encounter happened because she was cry-ing openly at work about not being promoted. (*Id.* ¶ 235.) Henson contends that she complained to O'Neill because she felt that she was being treated unfairly at the company because she was African–American. (*Id.* ¶ 236.)

O'Neill asserts that she did not think Henson was complaining of racism at McGraw–Hill. (Def. Rule 56.1 ¶ 55.) Rather, O'Neill claims that Henson was crying because of "several upsetting events" Henson had experienced in her life recently. (*Id.* ¶ 52.) In particular, O'Neill contends that Henson described a time when she had been robbed at gun point in Harlem. (*Id.* ¶ 53.) It is in this context that O'Neill claims Henson said, "You don't know what it's like being black." (*Id.* ¶ 54.)

Additionally, Henson contends that she frequently voiced her complaints about discrimination as a member of the "voluntary" African American Affinity Group (hereinafter, "AAAG") and Diversity Council at McGraw–Hill. (*See* Pl. Rule 56.1 ¶¶ 214, 238, 240.) As a member of AAAG, Henson contends that she regularly provided reports to O'Neill and Latimer, which purportedly showed African–American employees received fewer promotions and had lower grade levels, turnover rates, and salaries than Caucasian employees in similar positions at the company. (*Id.* 56.1 ¶¶ 236–37.)

The details of Henson's applications for the RSC and HR Rep positions are relevant to this case.

### 1. RSC Application

McGraw–Hill posted the opening for the RSC position internally on its "intranet,"

---

2. The defendant claims that this conversation occurred on or about December 20, 2004. (Def. Rule 56.1 ¶ 52.)

3. On paper, these statements appear to be two slightly different versions of the same thing. Of course, it is possible that the issue is one of tome of voice, which cannot be captured in a transcript.

and Henson submitted an application for the position using the same. (Def. Rule 56.1 ¶ 38.) The position required the employee to work long hours, travel to different college campuses, attend career fairs, organize job interviews, and work with vendors. (Rasin Decl. Ex. UU ¶ 4 (hereinafter, "O'Connor Aff.").) McGraw–Hill purportedly preferred that applicants for the job have experience working with university career services offices. (*Id.*) The RSC position was a grade level 16 position. (Henson Tr. B. at 127:25–128:8.)

Deborah O'Connor ("O'Connor"), the hiring manager for RSC, interviewed Henson for the position by phone. (O'Connor Aff. ¶ 5.)

Henson did not receive the RSC job; rather, O'Connor hired an external candidate, Blessing Mariano ("Mariano")—an Asian female. (*Id.* ¶ 6.) Henson contends that she was told that the reason she did not get the RSC job was because Mariano "had more finance recruiting experience." (Henson Tr. A. at 129:6–7.) Henson maintains that regardless of Mariano's qualifications, this explanation "made no sense," (Pl. Rule 56.1 ¶ 41.), because Henson "worked in finance for three years and . . . had recruiting experience, assisted with National Black MBA, National Council of Laraza . . . Recruiting." (Henson Tr. A. at 129:8–11.)

Henson argues that she was qualified for the position because: (1) she traveled on recruiting events previously, including trips to Florida and Wisconsin; (2) she worked long hours; and (3) she had acquired interview and recruiting experience at McGraw–Hill. (Pl. Rule 56.1 ¶¶ 34–35, 39, 41–42.) She contends that she was more qualified than Mariano because she (1) had a Master's Degree and Mariano did not, (2) had recruiting experience at McGraw–Hill and Mariano did not, and (3) had a higher required skill and asset score

than Mariano—9/17 and 2/4 compared to 7/17 and 1/4. (*Id.* ¶ 40.)

## 2. HR Rep

In or about June 2005, Henson applied for the HR Rep position. (Def. Rule 56.1 ¶ 46.) She met the basic qualifications for the position. (Solotoff Decl. Ex. Fisher Tr. at 166:5–19 (hereinafter, "Fisher Tr. A.").)

The hiring manager for the position was Rich Fisher ("Fisher"). (Def. Rule 56.1 ¶ 47.) He does not remember interviewing Henson for the position. (Rasin Decl. Ex. I at 167:21–168:4 (hereinafter, "Fisher Tr. B.").) This accords with Henson's statement that Fisher did not interview her. (Pl. Rule 56.1 ¶ 47.)

Fisher offered the HR Rep position to another candidate, Jessica Brookins ("Brookins")—a Hispanic female. (*See* Def. Rule 56.1 ¶¶ 47, 51; Pl. Rule 56.1 ¶¶ 51, 220.) Fisher testified that the reason he hired Brookins was, "Her performance review was rated a 5, highest possible. She was also on a higher grade level when she applied for the job as well." (Fisher Tr. B. at 169:18–21.)

Henson contends that Fisher's reasons are pretextual. She argues that Fisher never intended to hire an African–American woman for the job, and that he refused to meet with Henson because she is African–American. (Pl. Rule 56.1 ¶¶ 49, 216.) Henson also argues that Fisher did not approve of the existence of AAAG and the Diversity Council or her participation in the groups, (*id.* ¶ 238), and that he frequently made racist and hostile comments about African–Americans in the workplace. (*Id.* at 216–17.)

For example, before Fisher announced his decision to hire Brookins, he told Pilgrim five or six times that he was not going to hire a "Black woman" for the job.

(Solotoff Decl. Ex. Pilgrim Aff. ¶ 4 (hereinafter, "Pilgrim Aff.").)

The HR Rep position was the last job Henson applied for at McGraw–Hill. (Pl. Rule 56.1 ¶ 225.)

Around the same time that Henson applied for the HR Rep position, she applied for a position with the New York City Department of Education ("NYC DOE"). (Pl. Rule 56.1 ¶ 56.) On or about July 17, 2005, the NYC DOE offered Henson a position as a Special Assistant to the Deputy Director, Medical Leaves and Benefits, with a starting salary of $68,000. (Def. Rule 56.1 ¶ 58.) At the time, Henson's salary with McGraw–Hill was approximately $45,000. (*Id.* ¶ 59.)

On or about July 22, 2005, Henson accepted the job with NYC DOE. She stopped working at McGraw–Hill on August 12th. (Pl. Rule 56.1 ¶ 60.)

During Henson's exit interview, which was held on her last day of work, she told the company that it discriminated against her and other employees on the basis of race. (*Id.* ¶ 249.) Henson claims that McGraw–Hill never investigated her complaints. (*Id.*)

### B. Timeliness of Claims

In the initial complaint, Henson alleges that McGraw–Hill denied her five promotions based on her race in violation of Title VII, section 1981, the HRL, and the CHRL. Each of these statutes has a different statute of limitations.

#### 1. Title VII

Title VII requires that a plaintiff file a charge of discrimination with the EEOC before bringing suit in federal court. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). In New York, a "dual filing" state, a plaintiff has 300 days from the time the allegedly discriminatory act

occurred to file a Title VII charge with the EEOC or the New York State Division of Human Rights. *Id.* "A claim is time barred if it is not filed within these time limits." *Id.*

Henson filed her EEOC charge on December 16, 2005. Three hundred days prior to that date is February 19, 2005. Accordingly, Henson's failure to promote claims with respect to 1) Talent Acquisition Specialist, corporate segment, for which she applied in June 2003; 2) HR Representative at IMS, for which she applied in September 2003; 3) HR Representative at MHE, for which she applied on or around October to December 2003; and 4) RSC at S & P, for which she applied in November 2004, are time barred.

In her opposition to summary judgment, Henson concedes that she "is not seeking to challenge any position that is time barred." (Def. Opp'n at 3.) However, she asserts for the first time in her opposition brief that she applied for a "Talent Acquisition HR, Corporate" position in 2004, not 2003. (*Id.*) This assertion is not supported by any evidence and is contrary to Henson's own testimony and admission of undisputed facts. (Henson Tr. B. at 105:9–12; Pl. Rule 56.1 ¶ 31.) Moreover, it would make no difference, since the 300 day period begins to run in February 2005.

Henson's only remaining Title VII promotion claim is for the HR Rep position at S & P, for which she applied in June 2005. Her claims based on this position are timely under all four statutes.

#### 2. Section 1981

Employment discrimination claims under section 1981, which provides a separate and independent remedy from Title VII, *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 465–66, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), have a four year statute of limitations. *Jones v. R.R. Don-*

*nelley & Sons Co.*, 541 U.S. 369, 382–83, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004).

Henson filed this lawsuit on July 23, 2007. Therefore, all discrimination claims based on events prior to July 23, 2003, are time-barred. Accordingly, Henson's claim about the failure to promote her to Talent Acquisition Specialist in or about June 2003 is untimely.

### 3. HRL/CHRL

■ New York HRL and CHRL allow a party three years from the date of any allegedly discriminatory act to file suit. N.Y. C.P.L.R. § 214(2); N.Y. City Admin. Code § 8–502(d); *Lambert v. Genesee Hosp.*, 10 F.3d 46, 59 (2d Cir.1993) (noting three year limitation applies to the HRL); *Milani v. Int'l Bus. Machines Corp., Inc.*, 322 F.Supp.2d 434, 451 (S.D.N.Y.2004) (noting that CHRL is subject to a three year statute of limitations). Since Henson filed suit on July 23, 2007, all alleged denials of promotion that occurred prior to July 23, 2004, are time barred by the HRL and CHRL.

Accordingly, Henson's claims about the failure to promote her to the Talent Acquisition Specialist, HR Representative at IMS, and HR Representative at MHE positions are time barred.

To summarize, Henson may challenge the failure to promote for any position in the chart below where her claim is labeled "Timely."

| Positions | Date | Title VII | Section 1981 | HRL/CHRL |
| --- | --- | --- | --- | --- |
| Talent Acq. Specialist | June 2003 | Untimely | Untimely | Untimely |
| HR Rep IMS | Sept. 2003 | Untimely | *Timely* | Untimely |
| HR Rep MHE | Oct./Dec. 2003 | Untimely | *Timely* | Untimely |
| RSC | Nov. 2004 | Untimely | *Timely* | Untimely |
| HR Rep S & P | | *Timely* | *Timely* | *Timely* |

Henson's claim about the failure to promote her to the position of Talent Acquisition Specialist on June 2003 is time barred under all four laws and is dismissed. Since the standard of assessing whether there has been discrimination is the same under all the statutes, timeliness under any of the statutes is sufficient

### C. Discrimination and Retaliation

#### 1. HR Representative positions at IMS and MHE

##### a. Discrimination

There is no dispute that Henson belongs to a protected class.

■ Henson has not provided any evidence that she applied for the positions of HR Representative at IMS and MHE. She effectively concedes as much by not addressing defendant's argument in her opposition to summary judgment. Her failure to offer proof that she applied for these positions is fatal to her claim.

■ The second element of a *prima facie* case for failure to promote—that she applied for the job and was rejected— "cannot be established merely with evidence that a plaintiff generally requested promotion consideration. A specific application is required . . . ." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 227 (2d Cir.2004). The specific application requirement may be excused only if the employee demonstrates that "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." *Id.*

Since Henson has not offered any evidence that she specifically applied for the HR Representative positions at IMS and MHE, and she has not offered any evidence to demonstrate that the specific application requirement should be excused (for example, she offers no evidence that either of these openings was not posted), she has failed to establish one element of her *prima facie* case for failure to promote based on race.

### b. Retaliation

Henson claims that she was denied these two positions in retaliation for her complaints of race discriminations. However, she has not offered enough evidence to make out a *prima facie* case of retaliation.

■ "Plaintiff must submit evidence of a causal connection between her protected act," *Ramos–Boyce v. Fordham University*, 419 F.Supp.2d 469, 475 (S.D.N.Y.2005), and her failure to be promoted. It is impossible for Henson to establish a causal connection about the failure to promote her for these two positions without providing some type of evidence that she sought the promotions. Since there is not a scintilla of evidence in the record that she submitted applications for the HR Representative positions at IMS and MHE, her "retaliation claim[s] [are] easily dismissed for failure to offer any evidence in support thereof." *Id.* at 476.

Accordingly, defendant's motion for summary judgment about Henson's employment discrimination and retaliation causes of action about the HR Representative positions at IMS and MHE is granted.

The two remaining positions Henson contends she applied for—and for which her claims are timely—are HR Rep at S & P and RSC at S & P.

### 2. HR Rep at S & P

#### a. Discrimination

Henson has provided sufficient evidence to make a *prima facie* case, under all four statutes, for failure to promote when she applied for the HR Rep position at S & P in June 2005. The parties do not dispute that: 1) she belongs to a protected class; 2) she applied for HR Rep at S & P; 3) she did not receive the job; 4) and McGraw–Hill hired a different applicant after it rejected her for the position.

■ Defendant argues that Henson was not qualified for the position because the person hired was a grade level 16, and Henson was a grade level 13. Henson offered evidence that suggests she was qualified for the position. For example, the hiring manager for the position, Fisher, testified that Henson met the criteria for the position. (*See* Fisher Tr. A. at 165:20–166:18.) Thus, there is a genuine issue of dispute about her qualifications, which precludes summary judgment.

Defendant argues that even if Henson satisfies the *prima facie* requirements, there is a legitimate non-discriminatory reason for why Henson did not receive the job. McGraw–Hill contends that Fisher hired another candidate, Brookins, because she received higher ratings on her performance evaluations than Henson, and that she already achieved the same grade level—16—as the HR Rep position, while Henson had not. Henson's grade level was 13.

Henson submits, that based on the evidence in the record, Fisher's explanation for why he hired Brookins is pretextual. Disputed issues of fact preclude resolution of this issue on summary judgment.

Henson offered the testimony of another employee, Pilgrim, who stated that Fisher told her that he would not hire an African–American woman for the HR Rep position.

Pilgrim also testified that he made a number of racist comments about African–Americans in the work place. If the jury believes that Fischer made such comments, they would be are sufficient to allow a jury to infer that discriminatory reasons (i.e., racism) affected his hiring decision. *See e.g., Schreiber v. Worldco, LLC,* 324 F.Supp.2d 512, (S.D.N.Y.2004).

In *Schreiber,* the court denied defendant's motion for summary judgment. The court had to determine whether comments about the plaintiff's age demonstrated discriminatory intent. The court noted that, "In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative "stray remark," a court should consider the following factors: (1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process." *Id.* at 519. The court held that the comments that a supervisor and others made about age, around the time of the employment decision, could allow a jury to conclude that the employment decision had a discriminatory intent. *Id.* at 522–23.

In this case, Fisher had the authority to decide who to hire for the HR Rep position. Prior to making his decision—and around the time he was making it—he purportedly made racist comments about African Americans, including one where he said he would not hire African Americans. If made, his statements evidence a strong prejudice against African–Americans in connection with his decision to hire someone for the HR Rep position.

Defendant argues that Fisher's statement is not admissible because it is hearsay. The defendant is wrong.

Under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay when made "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R.Evid. 801(d)(2)(D). "To show that the statement is not hearsay, [a party] must show: '(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.' " *U.S. v. Rioux,* 97 F.3d 648, 660 (2d Cir.1996) (*quoting Pappas v. Middle Earth Condominium Ass'n,* 963 F.2d 534, 537 (2d Cir.1992)).

In *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235 (2d Cir.1995), the court reversed the district court's decision granting the defendant summary judgment on the plaintiff's Title VII and VFEPA claims. The court found that the testimony of two employees about the reason why the plaintiff was fired—because the supervisor did not respect women in positions of authority—was admissible under Federal Rule of Evidence 801(d)(2)(D). *Id.* at 1238 n. 1. The statements were not hearsay because they were made by a supervisor concerning plaintiff's employment. *Id.*

■ For similar reasons, Fisher's statements clearly are a party admission under 801(d)(2)(D), and are admissible. McGraw–Hill gave Fisher the power to make hiring decisions for it. Pilgrim testified that Fisher, in his capacity as the hiring manager, told her that he would not hire African–Americans for the HR Rep position. She also heard him make discriminatory remarks about African–Americans during this time period. Thus, Pilgrim's testimony about Fischer's statements is not hearsay, because it is testimony about

statements that Fisher made as a hiring manager, and it relates to a matter within the scope of his agency i.e., his ability to hire someone for the company. It is also not hearsay because it is offered for the fact that the comments were made—not to prove the truth of their content.

Accordingly, defendant's motion for summary judgment about the failure to promote Henson to the HR Rep position is denied.

### b. Retaliation

█ Henson contends that McGraw–Hill did not promote her to the HR Rep position in retaliation for her complaints about race discrimination.

Henson has offered evidence that she complained repeatedly, over a very long period of time, about race discrimination. She has offered evidence that she applied for the HR Rep position at S & P after she voiced some of these complaints.

This evidence is enough to get her to a jury. It establishes that she engaged in a protected activity (her complaints), that McGraw–Hill knew about the complaints, and that she did not receive the promotion after she complained.

Defendant claims Henson's evidence fails to establish a causal connection between her complaints and the decision not to promote her. This argument merely raises a disputed issue of fact about the timing of her complaints because Henson claims that her complaints about race discrimination were pervasive, and that some of them were made after she applied for the position.

Accordingly, defendant's motion is denied.[4]

### 3. RSC at S & P

### a. Discrimination

Henson has provided sufficient evidence under section 1981 to get to a jury about her claim that McGraw–Hill discriminated against her by not offering her the RSC position.

Henson provided the minimal evidence necessary to make her *prima facie* case. *See Joseph v. Leavitt,* 465 F.3d 87, 90 (2d Cir.2006) (noting that making out the "minimal" *prima facie* case, even without evidence of discrimination, creates a presumption that the employer unlawfully discriminated, and places the burden of production on the employer to provide a non-discriminatory reason). She established that she belongs to a protected class, applied for the position, was qualified for it, did not receive it, and that the position was given to another applicant.

Defendant offers a non-discriminatory reason for why Henson was not hired. It argues that Mariano, the person hired, was the "best candidate" for the job because she had been doing the exact same job as the RSC position, but for a different employer.

Henson contends that defendant's non-discriminatory reason is pretextual. She offers evidence that O'Connor, the hiring manager for the RSC position, made racist comments, which demonstrates a discriminatory intent. O'Connor purportedly told Pilgrim that "Black children do not get kidnapped, no one kidnaps Black children," and "Diana Ross has never done anything for her people." Henson claims O'Connor also purportedly said "If someone was Black they were articulate; if someone was white they were smart."

---

**4.** Although the standard for a claim of retaliation under the CHRL is different, any claim that satisfies the more demanding federal or state standard for retaliation necessarily satisfies the standard under the CHRL.

This evidence is sufficient to raise a disputed issue of fact. There is a dispute about what O'Connor said. If Henson's evidence is true, a jury could find that O'Connor's explanation is pretextual.

#### b. Retaliation

Henson also gets to a jury on her claim of retaliation about the failure to promote her to the RSC position for the same reason she is entitled to a trial on her retaliation claim concerning the HR Rep at S & P.

Again, defendant's argument—that there is no causal connection between Henson's complaints and the decision not to promote her—only raises disputed issues of fact about the timing of her complaints and the decision not to promote her.

#### 4. Failure to Investigate

■ Henson's claim that McGraw–Hill's failure to investigate her complaints of discrimination after her exit interview constituted retaliation fails as a matter of law, because defendant's purported failure to investigate did not "affect[ ] the terms, privileges, duration or conditions of plaintiff's employment." *Thomlison v. Sharp Elec. Corp.*, 99 civ. 9539, 2000 WL 1909774, at *4 (S.D.N.Y. Dec. 18, 2000) (noting that a failure to investigate is not retaliatory).

This is equally true of her retaliation claim under the CHRL—which does not require that the employer's actions affect the terms, privileges, or conditions of employment—because under the CHRL a plaintiff still must offer evidence that the employer's action likely would cause a reasonable person to be deterred from engaging in the protected activity. Henson offers no such evidence, and makes no argument to suggest that a reasonable person would not make a complaint in her exit interview if the company would not

investigate it after the departure from the job.

Accordingly, defendant's motion for summary judgment about Henson's failure to investigate claim is granted.

Finally, to forestall an in limine motion: evidence that plaintiff specifically applied for a position prior to the time bar will be admitted in at trial as relevant background. Evidence that plaintiff was not promoted to positions for which she did not apply will not.

### IV. Curtis

Plaintiff Curtis began working at McGraw–Hill on or about May 29, 2002, as an Office Manager in the E–Business Department of S & P. (Def. Rule 56.1 ¶ 127.) She worked for the Executive Managing Director of Securities Services, Vladimir Stadnyk ("Stadnyk"). (*Id.*) She was considered an "expert" in computer software programs and spreadsheets, (Pl. Rule 56.1 ¶ 177(b)), and, among other duties as an office manager, she trained and supervised administrative assistants at the company.[5] (Def. Rule 56.1 ¶ 160.)

Curtis does not have a college degree; she also did not graduate from a high school, but she obtained a GED. (*Id.* ¶¶ 141, 147.)

In or about July 2005, McGraw–Hill eliminated Curtis' position in a corporate reorganization. (*Id.* ¶¶ 128–129.) She also learned that Eccri Gutierrez ("Gutierrez"), one of her trainees, would become Stadnyk's administrate assistant. (*Id.*; Pl. Rule 56.1 ¶ 128.)

The company kept her on its payroll until October 3, 2005. (Def. Rule 56.1 ¶ 129.)

**5.** Curtis does not offer any other evidence about what else she did as an office manager.

Curtis contends that she complained of race discrimination to Stadnyk, Joyce Hunsucker ("Hunsucker"), a former Director of HR, Gail Whelan ("Whelan"), a former Direct of HR, and Prema Menon ("Menon"). (Def. Rule 56. ¶ 170.) On or about September 30, 2005, Curtis talked to Marianne Gatinella (hereinafter, "Gatinella") as part of the company's investigation of Pilgrim's claim of discriminatory treatment at McGraw–Hill. (Id. ¶ 169.) Curtis told Gatinella that she "had some concerns around alleged discriminations, from her perspective, that she had seen." (Id.)

McGraw–Hill asserts that it never received any complaints of discrimination from Curtis. (Id. ¶ 171.) Curtis contends that Gatinella told her that McGraw–Hill had discriminated against her, and that the company should have investigated her complaints. (Pl. Rule 56.1 ¶ 173.)

After Curtis' position was eliminated, she applied for at least nine positions with McGraw–Hill: (1) Administrative Assistant/Office Manager to Vice President in Global Licensing and Contracts; (2) Office Manager in Vista Research, Inc.; (3) Assistant Compliance Officer Position; (4) Administrative Assistant to the Chief Information Officer of Technology for S & P; (5) Graphic Design Position in Marketing; (6) Administrative Assistant in Corporate and Government Ratings; (7) Administrative Assistant in S & P Ratings; (8) Administrative Assistant in Structured Finance, reporting to Paul Kelly; and (9) Administrative Assistant to the Senior Vice President of Global Client Services & Sales. (Def. Rule 56.1 ¶ 137.) Some of these applications were made prior to her departure from McGraw–Hill; some after.

McGraw–Hill did not hire Curtis for any of these positions.

On or about September 14, 2005, "in exchange for valid consideration," (id. ¶ 130), Curtis signed a Termination and Release Agreement (hereinafter, "The Agreement"). (Id.) As part of The Agreement, Curtis released McGraw–Hill from any liability that may have arisen out of her employment, including specifically claims under Title VII, section 1981, the HRL, and the CHRL. (Id. ¶ 131.) Curtis does not contend that this release is invalid. In fact, in her opposition to summary judgment, Curtis admits she released McGraw–Hill from hiring claims relating to her applications for positions (1), (2), (3), and (6) above, and they will not be mentioned again. (Pl. Rule 56.1 ¶¶ 139–40, 154, 156.) She contends that she did not release discriminatory failure to hire and retaliation claims relating to the other five positions; we now turn to a discussion of each.

### A. Administrative Assistant to the Chief Information Officer of Technology

Curtis contends that she should have been hired as the administrative assistant to the Chief Information Officer because she was better qualified, based on her experience as Stadnyk's office manager. (Id. ¶ 144.)

The position for the job became available in or about August 2005. (Rasin Decl. Ex. YY. ¶ 3.) Initially, McGraw–Hill offered the job to Michele Ormond, a Hispanic woman, because of her experience as an administrative assistant in data operations at the company. (Id. ¶ 5; Def. Rule 56.1 ¶ 144.) When she turned down the job, the company offered it to another African–American woman, Linda Terry–Courtrier, who had a bachelor's degree and had served as an executive assistant to a Chief Information Officer at a different company. (Rasin Decl. Ex. YY. ¶ 6; Def. Rule 56.1 ¶¶ 145–46.) Terry–Courtrier accepted the job. It is not clear from the record when Terry–Courtrier accepted it.

McGraw–Hill does not argue that Curtis' claim with regard to this position is time barred, and I will assume that it is not.

### 1. Discrimination

■ Curtis offered no evidence that anyone involved in the decision to hire the administrative assistant had a racial bias against African–Americans. There is simply no evidence suggesting an inference of discrimination. In fact, the successful candidate is also African–American. "Where no evidence giving rise to an inference of discrimination has been presented, the fact that a plaintiff is replaced with an individual within his protected class undermines his attempt to establish a prima facie case of discrimination." *Randolph v. CIBC World Markets*, 01 civ. 11589, 2005 WL 704804 at *12 (S.D.N.Y. Mar. 29, 2005) (citing other cases noting the same).

Accordingly, defendant's motion for summary judgment about its failure to offer Curtis the promotion on racial grounds is granted.

### 2. Retaliation

Curtis' contends that McGraw–Hill retaliated against her, for her complaints about race discrimination while she was an employee, by not re-hiring her for the administrative assistant position after she stopped working for the company.

Curtis does not offer any evidence to support her claim, except for her contention that she often complained of race discrimination at McGraw–Hill. This evidence satisfies the first two elements of a retaliation claim, but goes no further.

There simply is no evidence in the record that could allow a jury to determine that there is a causal connection between her purported protected activity and the decision not to hire her for the position.

Curtis claims curiously that the causal connection exists because she was more qualified for the position than anyone else.

This conclusory assertion does not prove a causal connection.

Accordingly, defendant's motion for summary judgment about this position is granted.

### B. Graphic Design Position in Marketing

■ A graphic design position in marketing became available in March 2005. (Rasin Decl. Ex. ZZ, ¶ 2.) It is not clear from the record when Curtis applied for this position.

Applicants for the Graphic Design position were to have a bachelor's degree and four to eight years of graphic design experience. (Def. Rule 56.1 ¶ 150.) Curtis did not meet either one of these requirements. (*Id.* ¶ 151.)

The successful candidate, Mary McDonald a Caucasian woman, had a bachelor's degree and over five years of graphic design experience. (*Id.* ¶ 152.)

Defendant's motion for summary judgment is granted. Curtis cannot establish a *prima facie* case of discrimination because she applied for a job for which she was not qualified, nor is there evidence of retaliation, since McGraw–Hill's explanation for why it did not hire her—lacking in qualifications—is undisputed and so cannot be pretextual.

### C. Administrative Assistant in S & P Ratings

Curtis applied for the administrative assistant position at S & P Ratings on or about November 20, 2005. (Pl. Rule 56.1 ¶ 160.) She contends that she was the best candidate for this position because she had trained and supervised administrative assistants at McGraw–Hill for "years," and is considered an "Expert" at Microsoft Excel and spreadsheets. (*Id.*)

Curtis argues that she did not get the job because Stadnyk disparaged her to Mariano, a another employee who was involved in the hiring decision. Among other things, Stadnyk purportedly told Mariano that Curtis had "child care issues" and "attendance" problems. (*Id.* ¶ 341.) Curtis contends that Stadnyk's criticism was unfair, untrue, and was not reflected in any of her prior reviews. (*Id.*)

McGraw–Hill hired Claudia Rodriguez, a Hispanic woman, who came highly recommended by the hiring manager's colleagues. (Rasin Decl. Ex. CCC, ¶¶ 4–5; Def. Rule 56.1 ¶ 160.) The successful applicant had eight years of prior experience working with Business Week, a McGraw–Hill division. (Def. Rule 56.1 ¶ 160.)

### 1. Discrimination

Curtis makes out a *prima facie* case of discrimination: she applied for the job, was qualified, did not receive the job, and the job remained opened after she applied.

Defendant submits that it hired a different candidate for the job because the candidate had eight years of experience at Business Week and came highly recommended by the hiring manager's colleagues. This reason, if true, is a legitimate, non-discriminatory reason. An "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

However, Curtis offers evidence that McGraw–Hill's non-discriminatory reason is false, which raises a genuine issue of disputed fact about pretext. Curtis contends that McGraw–Hill discriminated against on the basis of her race when Stadnyk made false and derogatory remarks to Mariano about Curtis' prior performance. The fact that Curtis failed to get the promotion after filing a claim of discrimination is also some evidence of discrimination.

It may well be that defendant hired a different candidate for the job because it thought the other candidate was more qualified. However, that issue must be decided at trial.

### 2. Retaliation

For similar reasons stated above about Curtis' discrimination claim for this position, she has offered enough evidence to go to trial for a claim of retaliation.

Viewed in the light most favorable, Curtis' evidence shows that she complained of discrimination, Stadnyk knew of the complaint, and he deliberately took actions to prevent her from getting a job because of her complaints. Thus, Curtis makes out a *prima facie* case of retaliation.

Defendant counters by arguing that Curtis cannot establish a causal connection between the protected activity and her failure to be hired because the hiring manager for the position did not know about Curtis' complaints. This knowledge argument fails as a matter of law because there is evidence that there was general corporate knowledge about Curtis' complaints. *See Kessler v. Westchester County Dept. of Social Servs.,* 461 F.3d 199, 210 (2d Cir.2006).

Moreover, there is evidence that Stadnyk injected himself into the hiring process simply to prevent Curtis from getting the job. It makes no difference if the hiring manager did not know of the complaint when, if true, Stadnyk's involvement prevented Curtis from getting the job. Stadnyk's behavior creates an issue of fact about the nexus between Curtis' complaint and McGraw–Hill's decision to hire someone else.

McGraw–Hill attempts to minimize Stadnyk's involvement and recommenda-

tion to Mariano by arguing that there is no evidence that Stadnyk mentioned the discrimination complaint to Mariano. This argument does not overcome Curtis' evidence that suggests otherwise; it shows only that there are disputed issues of fact.

Finally, McGraw–Hill offers a legitimate, non-discriminatory reason for hiring a different candidate. It claims the candidate that it hired was more qualified. However, Curtis' evidence raises issues of fact about the credibility of McGraw–Hill's explanation. There is some evidence that suggests Stadnyk intentionally sabotaged her job application.

Accordingly, defendant's motion for summary judgment is denied.

### D. Administrative Assistant in Structured Finance, reporting to Paul Kelly

In or about August 2005, an administrative assistant position opened up in structured finance.[6] (Rasin Decl. Ex. DDD ¶ 2.) The office manager for the structured finance group screened applicants for the position. (Def. Rule 56.1 ¶ 162.) Curtis received a first round interview for the job because her sister, who worked in structured finance, forwarded her resume to the office manager. (*Id.* ¶ 163.)

Curtis did make it to the second round of interviews. (*Id.* ¶ 164.) Instead, three other applicants, including an African American woman, were selected to move on. (*Id.*) Curtis contends that she was told that the reason she did not receive a second round interview was because "she was too skilled for the job." (Pl. Rule 56.1 ¶ 164.)

Pilgrim testified that the Nancy (Tomeo) Farrelly ("Farrelly")—who screened applicants for the position—told her that she "was not going to hire Brenda [Curtis] or

grant her an interview . . . because Brenda had made complaints about Vlad Stadnyk, and . . . would not be considering her for any open positions in Structured Finance." (Pilgrim Aff. ¶ 3.)

### 1. Discrimination

Curtis received an initial interview for the two administrative assistant positions in structured finance and was not hired. She contends that she was not hired for the positions because of race discrimination. She contends that Stadnyk made false and negative references about her to the people involved in the hiring decision in order to prevent her from getting the job. Curtis argues that Stadnyk did this because Curtis had complained previously that Stadnyk discriminated on the basis of race.

Curtis' evidence meets the *prima facie* standard for a failure to hire claim.

Defendant argues that Curtis' claim fails because there is no evidence that race played any part in the decision making process. In support of this argument, McGraw–Hill offers evidence that another African American was selected for a second round of interviews.

McGraw–Hill's argument fails to show there is no disputed issue of fact. A jury could infer discrimination if it believed Curtis' testimony that Stadnyk previously discriminated against her, and made a false and negative recommendation to prevent her from being re-hired. It makes no difference that McGraw–Hill advanced another candidate of the same race for a second round of interviews, because there is evidence to infer discrimination. *See Randolph*, 2005 WL 704804 at *12 (noting that such evidence only undermines a *prima facie* case—which, as a stage in *McDonnell Douglas* analysis, we are now

---

**6.** It is not clear from the record when Curtis applied for this position.

beyond—if there is *absolutely no evidence that could allow an inference of discrimination* ).

## 2. Retaliation

There is no doubt that Curtis has raised issues of fact for a jury about whether McGraw–Hill retaliated against her by denying her the administrative assistant position in structured finance.

Curtis offers evidence that Farrelly—the person in charge of screening applicants—told Pilgrim that she was not going to hire Curtis for the job because of her complaints about Stadnyk's behavior.

Pilgrim's testimony establishes that the requirements for a *prima facie* case of retaliation have been met. Farrelly knew of Curtis' complaints and refused to consider her for open position in structured finance because she complained.

Defendant argues that Pilgrim's testimony is inadmissible hearsay. This argument is rejected.

This is the second time defendant cries foul by arguing that potentially damning evidence is inadmissible. The Rules of Evidence are not so easily manipulated. As discussed already, under Federal Rule of Evidence 801(d)(2)(D), a statement is not hearsay when it is made by a party's agent. There are three requirements—as discussed above—that must be met to show a statement is a party admission.

■ Here, Curtis easily proves Farrelly's statements concerned "a matter within the scope of … employment." Fed. R.Evid. 801(d)(2)(D). First, the evidence shows Farrelly worked for McGraw–Hill and had the authority to screen applicants for the position, which is enough to satisfy the first element of the test under 801(d)(2)(D). Second, Curtis' evidence provides that Farrelly's statement was made in her capacity as the office manager in charge of screening applicants for the

position—the second element is met. Finally, Curtis' evidence shows that Farrelly decided which applicants received interviews. Such evidence satisfies the final element of the test because an employee "need only be an advisor or other significant participant in the decision-making process that is the subject matter of the statement." *Rioux,* 97 F.3d at 661. Accordingly, Farrelly's statement was within the scope of her employment, and it is admissible.

Defendant contends that, even if Farrelly's statement is admissible, it does not prove that she knew that the complaints about Stadnyk involved discrimination. This argument is too clever by half. As previously discussed, the knowledge requirement is satisfied by general corporate knowledge. McGraw–Hill knew Curtis complained about race discrimination—that is enough. Furthermore, defendant's argument merely raises a disputed issue of fact. Farrelly claims that she did not know the complaints were about discrimination. Considering the totality of Curtis' evidence—discussed above—it is possible that a jury might not credit Farrelly's testimony.

Accordingly, defendant's motion for summary judgment is denied.

## E. Administrative Assistant to the Senior Vice President of Global Client Services & Sales

Curtis applied for the administrative assistant to the Senior Vice President of Global Client Services & Sales on or about September 1, 2005. (Pl. Rule 56.1 ¶ 166.) McGraw–Hill maintains that no one was interviewed or hired for the position. (Def. Rule 56.1 ¶ 167.) McGraw–Hill contends that the hiring for this position was cancelled because the Vice President determined he did not need a full-time ad-

ministrative assistant. (*Id.* ¶ 166.) Curtis responds by arguing that when she applied for the position, it remained opened, and the position was not cancelled until April 3, 2006. (Pl. Rule 56.1 ¶ 167.)

### 1. Discrimination and Retaliation

Curtis offers no evidence of either discrimination or retaliation in connection with her failure to get this position. Rather, the undisputed evidence shows that no one was ever interviewed for the position McGraw–Hill cancelled the position requisition, and never filled the job.

Accordingly, defendant's motion for summary judgment is granted.

### F. Letter of Recommendation

When Curtis left McGraw–Hill, Stadnyk gave her a letter of reference. (Def. Rule 56.1 ¶ 132.) Initially, Curtis did not like Stadnyk's letter of reference, in part, because the letter did not properly identify her as an Office Manager at McGraw–Hill. (*See* Pl. Rule 56.1 ¶ 134.) Curtis asked that her letter be revised. She received a second letter of reference on or about October 6, 2005; it comported with her requests. (Def. Rule 56.1 ¶ 135; Pl. Rule 56.1 ¶ 136.)

Curtis' contends that Stadnyk retaliated against her based on the content of his letter of recommendation. This argument has no merit.

The undisputed evidence shows that Curtis did not like her original letter of recommendation, so Stadnyk revised it and incorporated her comments. He gave her a letter that said what she asked for. There is no evidence that anything adverse happened to Curtis, and she does not argue otherwise.

Accordingly, defendant's motion for summary judgment as to this claim is granted.

## V. Spencer

### A. Background

On or about December 5, 2000, plaintiff Spencer joined McGraw–Hill as a Senior Manager of HR in the corporate segment. (Def. Rule 56.1 ¶ 62.) In that position, she earned approximately $80,000 and was a grade level 19. (Pl. Rule 56.1 ¶ 63.) Spencer has a Master's Degree in Human Resources and Organizational Development. (*Id.* ¶ 257.)

From December 2000 until February 2005, Spencer worked as part of a group that provided HR support to the Publication Services Group ("PSG"). She reported to Bill Harper ("Harper"), an African American male who was Director of HR for PSG, directly. (Def. Rule 56.1 ¶ 64.) In her position, Spencer's duties included, *inter alia*: organizing and conducting employee training; coordinating the intern and other diversity recruitment programs; resolving employee relations issues and addressing employees' questions; developing leadership programs for department heads; and providing HR support to the management employees of Business Week and other business department within PSG. (*Id.* ¶ 65; Pl. Rule 56.1 ¶ 65.)

Initially, Spencer performed well in her position. She received "performance exceeded expectations," the second highest rating, in her 2001 and 2002 performance reviews. (Def. Rule 56.1 ¶ 66.) However, in 2003 and 2004 her performance reviews were mixed. Harper determined that certain aspects of Spencer's performance required improvement, including her verbal communications skills and ability to conduct training. (*Id.* ¶ 67.) In other areas, she received ratings of "exceeds expectations" or "frequently exceeds performance standards." (Pl. Rule 56.1 ¶ 260.) During this time period, she continued to receive

pay increases based on her performance. (*Id.*)

Defendant contends that, based on Spencer's mixed performance, Harper gave her feedback so she could improve. (Def. Rule 56.1 ¶ 68.) Additionally, Harper told Spencer she should meet with Peter Delisser ("Delisser"), a communications specialists, so that she could improve her communications skills. (*Id.* ¶ 69.) Spencer contends that Harper never provided her with feedback and that she met with Delisser on her own. (Pl. Rule 56.1 ¶¶ 68–69.)

In or around February 2005, Ken Caruso ("Caruso") joined McGraw–Hill as a Senior Director of HR in the corporate segment. He became Spencer's direct supervisor. (Def. Rule 56.1 ¶ 76–77.) Spencer and Caruso focused their services on providing HR support to Business Week. (*Id.*)

McGraw–Hill contends that Caruso—like Harper—found deficiencies in Spencer's oral communication skills and ability to conduct training sessions. (*Id.* ¶ 78.) Additionally, the defendant offers evidence that Caruso received complaints about her performance from other clients at Business Week. (*Id.* ¶ 79.) McGraw–Hill asserts that he noted these deficiencies in her 2005 performance review. (*Id.* ¶ 82.)

Spencer disputes McGraw–Hill's characterization of her performance, and presents instances of where she was praised for her performance. (*See* Pl. Rule 56.1 ¶¶ 78–83) Additionally, she offers evidence that shows that she disagreed with her 2005 performance review and signed it under protest. (*Id.* ¶ 81.) By the time of this review, Spencer had filed a claim of employment discrimination with the EEOC. (*Id.*) She argues that Caruso only wrote the 2005 review after the company had received notice of the EEOC charge. (*Id.*)

Spencer filed the EEOC charge in part because of Caruso's conduct. Once he became her supervisor, Spencer contends that he engaged in a series of discriminatory practices against her. She submits that he called her into his office, referred to woman as "bitches," and used the words "fuck" and "shit" in every conversation. (*Id.* ¶ 263.) Spencer contends that during these conversations, when she was the only person in the room, he uttered these words while looking directly at her. (*Id.* ¶ 96.) Furthermore, Spencer argues that Caruso used this offensive language in front of other African Americans, but never in front of white male or female employees. (*Id.*)

In the Spring of 2005, Spencer complained to Caruso about his behavior. (*Id.* ¶ 269.) Spencer contends that Caruso responded by taking away her job responsibilities and diminishing her visibility with business partners. (*See id.* ¶¶ 88, 266, 268.)

In or about December 2005, Spencer complained to Brett Marschke ("Marschke"), the Vice President of HR for IMS, about Caruso's conduct. (*See* Def. Rule 56.1 ¶ 85; Pl. Rule 56.1 ¶ 85.) During this conversation, Spencer asserts that she told Marschke that she felt Caruso discriminated against her and treated white men and women differently. (Def. Rule 56.1 ¶ 86.) In response, Marschke told Spencer that he would discuss her complaint with O'Neill and Caruso. (*Id.* ¶ 87.) She contends that she complained to Marschke because Caruso said—in response to Spencer's repeated complaints of discrimination—that "complaining minorities should leave." (*Id.* ¶ 270.)

It was also during this time period, that Spencer filed her complaint of discrimination with the EEOC. (*Id.* ¶ 183.)

Marschke contacted both O'Neill and Caruso after he spoke with Spencer. (*See id.* ¶¶ 90, 93.)

When Marschke talked to Caruso, he reprimanded him for using profanity in the workplace. (*Id.* ¶ 92.) Caruso admitted he used profanity, but denied that he called women "bitches." (*Id.* ¶ 94; Pl. Rule 56.1 ¶ 94.) Instead, he asserts that he may have used the word "bitch" as an expletive in phrases like "son of a bitch" or "what a bitch." (Def. Rule 56.1 ¶ 94.) Spencer disputes this. (Pl. Rule 56.1 ¶ 94.)

Although Marschke reprimanded Caruso, Spencer maintains that he never followed-up to see if Caruso changed his behavior and stopped cursing. (Def. Rule 56.1 ¶ 87.) Spencer contends that Caruso stopped cursing briefly, only to resume doing so soon after. (*Id.* ¶¶ 100–01.).

Later on, Spencer and O'Neill discussed Caruso's conduct toward her. (*See* Pl. Rule 56.1 ¶ 90.) Spencer complained to O'Neill about Caruso's language and behavior. (*Id.*) O'Neill asserts that she did not believe these complaints were about race discrimination. (Def. Rule 56.1 ¶ 91.)

During their discussion, O'Neill asked Spencer if she would meet with her and Caruso so that O'Neill could mediate the problems. (*Id.* ¶ 102.) Spencer refused because she believed O'Neill did not have a reputation for solving problems involving minorities. (Pl. Rule 56.1 ¶ 103.)

In April 2006, Spencer asked to be transferred out of Business Week in order to get her away from Caruso. She interviewed for a position in Education with Mike McGlynn. (*Id.* ¶ 104.) Instead of being transferred to this position, O'Neill recommended that Spencer be sent to the Business Information Group ("BIG") as a Senior HR Manager. (*See* Def. Rule 56.1 ¶¶ 105–09; Pl. Rule 56.1 ¶ 109.)

Around this same time period, which is after the company received the EEOC charge and Caruso gave Spencer a negative performance review, McGraw–Hill conducted a review of Caruso. In this review, there is a suggestion that one solution to Caruso's relationship problems with his staff, including Spencer, is to counsel them out of the business. (Pl. Rule 56.1 ¶ 282.)

Ultimately, Spencer argues that she her request to be transferred away from Caruso became moot, because Caruso was being transferred out of Business Week to a different division in a different state, California. She contends that McGraw–Hill knew about Caruso's move to California before the company made the decision to transfer her to BIG. (Pl. Rule 56.1 ¶ 109)

Around the same time, Spencer contends that Caruso came by her cubicle and inappropriately grabbed his crotch. (*Id.* ¶ 286.) Spencer became visibly upset by this gesture and started to cry. (*Id.*) Caruso insists that this incident never happened. (Def. Rule 56.1 ¶ 111.)

Around the beginning of June, Spencer transferred to the position at BIG. (*Id.* ¶ 113.) She did not want to go, and only agreed to do so because she thought that if she did not do so her job and career would be jeopardized. (Pl. Rule 56.1 ¶ 112.) Spencer contends that she was so upset about the transfer that she had her therapist call O'Neill to protest on her behalf. (*Id.*)

In addition, right before her transfer, Caruso purportedly wrote a "blistering" letter to HR attacking Spencer. (*Id.* ¶ 296.) He purportedly wrote the letter so that it could be permanently included in her personnel file. (*Id.*)

In her new position at BIG, Spencer reported directly to Toi Eaton, Director of HR, who reported to Harper. (Def. Rule

56. ¶ 114.) After the transfer, she no longer had any contact with Caruso. (*Id.*) Indeed, Caruso was reassigned to a new division in California.

Spencer's pay, benefits, and grade level remained the same in this new position. (*Id.* ¶ 107) However, she contends that her job responsibilities changed significantly, and that the job at BIG did not provide her with the same types of opportunities for promotion, pay increases, and bonuses as her former job with Business Week did. (Pl. Rule 56.1 ¶ 107.)

Toward the end of 2006, she took a leave of absence. (*Id.* ¶ 117.)

In early 2007, Spencer told O'Neill that she was leaving McGraw–Hill. (Def. Rule 56.1 ¶ 120.) Spencer argues that she left McGraw–Hill because she felt forced out of the business based on the transfer and reduction in her job responsibilities. (*See* Pl. Rule 56.1 ¶ 123.)

On or about February 2, 2007, Spencer officially resigned from the company. She now works at Spencer Healthy Life. (Def. Rule 56.1 ¶ 126.)

### B. Discrimination

Spencer clearly has established her *prima facie* case of race discrimination. It is undisputed that she is a member of a protected class. Spencer was qualified for her position because she was promoted to that position at Business Week, and remained in the position until she was transferred to BIG. Her evidence about Caruso's conduct—his profanity and decision to reduce her job responsibilities—if true, supports her argument that she experienced adverse employment actions that give rise to an inference (albeit a weak one) of race discrimination. *See Feingold,* 366 F.3d at 152–53.

Spencer and McGraw–Hill go back and forth over whether she experienced an adverse employment action, but the gist of McGraw–Hill's argument—that the reduction on Spencer's job duties was insignificant and deserved because of her poor performance—only highlights disputed issues of fact.

In this Circuit, employments actions that have been considered sufficiently adverse include: 1) termination of employment; 2) a demotion evidenced by being given a less distinguished title, a significant reduction in material responsibilities, a decrease in wage or salary, or a loss of benefits, *see Kessler,* 461 F.3d at 207 (*citing Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 128 (2d Cir.2004)); 3) "a transfer ... if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," *id.* at 206; and 4) other indices that are unique to a particular situation. *Id.* at 207.

The sum of Spencer's evidence raises issues of fact as to whether the reduction in her job responsibilities evidenced a demotion. If believed, her claim that she was denied significant business contacts to which she previously had access, and that she only received clerical work, could allow a jury to find that Caruso demoted her because of her complaints of race discrimination.

Defendant argues that, even if Spencer's contentions are true, there is a legitimate, non-discriminatory reason for why Caruso reduced Spencer's job responsibilities.

McGraw–Hill contends that weaknesses in Spencer's job performance required Caruso to change her duties. McGraw–Hill offers evidence that prior to Caruso's taking over, Spencer's reviews indicated she exhibited weaknesses in her verbal communications skills and in conducting training. Furthermore, McGraw–Hill argues that there is evidence that Spencer's

clients complained to Caruso about her performance. Defendant asserts that none of the evidence Spencer offers demonstrates that the decision to reduce her job responsibilities involved race.

■ However, Spencer's evidence, if believed, is sufficient for a jury to find that defendant's explanations are pretextual. First, there is evidence that Caruso's review was done after Spencer made her complaints known to him, which could allow a jury to question the veracity of the review. Second, the fact that Spencer received other mixed performance reviews does not preclude a jury from inferring race discrimination. In her prior mixed reviews, Spencer did not have her job responsibilities reduced and she received pay raises. Under Caruso, who caused Spencer to complain about race discrimination, her job responsibilities were reduced before she received a bad review and after she complained to him about his behavior. Finally, there is some evidence that Caruso told Spencer that any minorities that complained about his behavior should leave. Based on the totality of this evidence, a reasonably trier of fact could infer race discrimination.

Accordingly, defendant's motion for summary judgment on Spencer's race discrimination claim is denied.

## C. Retaliation

Spencer presented evidence that is sufficient to create a genuine issue of fact as to whether McGraw–Hill retaliated against her.

Viewed in the light most favorable to Spencer, the evidence shows that Spencer's job duties were consistent with her position before she complained to Caruso about his behavior. Even though Spencer received mixed feedback on some areas of her performance before working for Caruso, her job duties never changed. It was not until she complained to Caruso about his behavior that he cut off Spencer's client contact, told others to bypass Spencer, and only gave her clerical work.

Furthermore, the evidence shows that Spencer complained to Marschke after Caruso told her that "complaining minorities should leave." To resolve the issues with Caruso, Spencer proposed being transferred to a different division to move away from him. After McGraw–Hill learned of the EEOC charge, it decided to send Spencer to a division she did not want to go to. Spencer found the transfer to be so undesirable that she had her therapist call O'Neill to object on her behalf. Moreover, Spencer's evidence suggests that the transfer might not have been necessary because Caruso was leaving her division and would no longer be her supervisor.

Around the same time that McGraw–Hill learned of the EEOC charge, Spencer received her 2005 performance review, which she signed under protest. Contemporaneously, Caruso received his performance review, which stated, *inter alia,* that McGraw–Hill was considering counseling Spencer out of the company.

From the totality of this evidence, a rational trier of fact could infer Spencer was retaliated against for complaining about race discrimination and filing an EEOC charge.

Defendant argues that the change in plaintiff's job duties and her transfer are not materially adverse; that there is no causal connection between these actions and Spencer's complaints. There are disputed issues of fact on both points

■ In *Kessler,* the court vacated and remanded the district court's judgment that granted defendant summary judgment. The plaintiff alleged that the defendant retaliated against him by transferring

him to a different position after he filed a discrimination complaint with the New York State Division of Human Rights. Defendant claimed the position was comparable to his prior position, but he submitted evidence that his duties were reduced. The court held that based on the Supreme Court's decision in *Burlington Northern*, 548 U.S. at 62–65, 126 S.Ct. 2405, a job transfer or reduction in duties may be materially adverse. The court noted that, "the standard for assessing such a reassignment is an objective, rather than a subjective one ... [it] depends upon the circumstances of the particular case and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Kessler*, 461 F.3d at 209 (citations and quotations omitted). An action is materially adverse if "the employer's actions ... [are] harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id*. (*citing Burlington Northern*, 548 U.S. at 57, 126 S.Ct. 2405). Since the evidence suggested that the transfer would take away the plaintiff's prior discretionary duties and force him to do low-level clerical work, the court found he had presented sufficient evidence to see a jury.

For similar reasons, Spencer's evidence could allow a jury to infer that her transfer and reduction in duties would dissuade a reasonable worker from complaining about discrimination.

■ Defendant's arguments about the timing of Spencer's complaints are unavailing at this stage. First, Spencer's evidence suggests she did not have her job responsibilities taken away until she complained to Caruso. This easily establishes a nexus between the complaint and the

retaliation. Second, her evidence shows the company sent her to a division she adamantly did not want to go around the time that McGraw–Hill learned of the EEOC charge. Again, the timing is enough to see a jury.

Defendant's response that the employee who made the decision to transfer her did not know of her complaint is insufficient as a matter of law. Even if defendant's evidence is true, in this Circuit the knowledge requirement does not require "anything more ... than general corporate knowledge that the plaintiff has engaged in a protected activity." *Id*. at 210 (citation and quotation omitted). Spencer's evidence that McGraw–Hill knew about the EEOC complaint meets this requirement.

Defendant also offers a legitimate, non-discriminatory reason for the decisions it made. But, as already discussed, that reason could well be deemed pretextual in light of the evidence presented. *See Kessler*, 461 F.3d at 206–11.

Finally, while it is true Spencer initially requested a transfer away from Caruso, her evidence shows she strongly opposed being transferred to BIG. The transfer to BIG happened only after the defendant received the EEOC complaint and her evidence, if believed, shows that she no longer needed a transfer (which she requested only to get away from Caruso), since Caruso was leaving.

Accordingly, defendant's motion for summary judgment on Spencer's retaliation claims is denied.

### D. Hostile Work Environment

■ Title VII [7] provides that "It shall be an unlawful employment practice for an employer ... to discharge any individual,

---

**7.** As noted above, the standard for a section 1981, HRL and CHRL claim is the same as Title VII.

or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race .... " 42 U.S.C. § 2000e–2(a). The phrase "terms, conditions, or privileges of employment" is broad enough to render actionable making an employee work in a discriminatory, hostile or abusive environment. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001). In order to prevail on a hostile work environment claim, a plaintiff must establish both that the work environment was hostile and that there is a specific basis for imputing the conduct that created the environment to the employer. *See Distasio v. Perkin Elmer Corp.,* 157 F.3d 55, 62 (2d Cir.1998); *Gallagher v. Delaney,* 139 F.3d 338, 347–48 (2d Cir.1998).

With respect to the first element, the plaintiff must show that his workplace was "'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Oncale v. Sundowner Offshore Servs. Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The test has both an objective and subjective component: "A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Mormol v. Costco Wholesale Corp.,* 364 F.3d 54, 58 (2d Cir. 2004) (quoting *Brennan v. Metro. Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999)). Moreover, the conduct of which plaintiff complains "must be sufficiently continuous and concerted in order to be deemed pervasive." *Feingold,* 366 F.3d at 150. "Simple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support" a hostile work environment claim. *Petrosino,* 385 F.3d at 223.

In determining whether the alleged harassment is of "such quality or quantity" as to meet the "severe and pervasive" standard, courts consider the totality of the circumstances, including such factors as the frequency of the conduct, its severity, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's work performance. *Harris,* 510 U.S. at 23, 114 S.Ct. 367; *see also Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir.1999) (per curiam).

■ The plaintiff is also required to show that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Howley v. Town of Stratford,* 217 F.3d 141, 153–54 (2d Cir.2000). Where, as here, the actionable hostile environment is created by a supervisor with immediate (or successively higher) authority over the employee, the employer is vicariously liable for the wrongful conduct. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). However, when no tangible employment action is taken against the employee, the employer may establish an affirmative defense to liability or damages by showing that (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275;

*Burlington Indus., Inc.,* 524 U.S. at 765, 118 S.Ct. 2257.

As an initial matter, defendant argues that Spencer's hostile work environment claim should be dismissed because she failed to assert such a claim in her EEOC charge.

■ In order to bring a hostile work environment claim in federal court, a plaintiff must first exhaust her administrative remedies. *See Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003). This means that a party may only raise claims in federal court that were asserted in its original administrative complaint or claims that "are reasonably related to those that were filed with the agency." *Id.* (quotation omitted).

■ "A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.* at 200–01. The reasonably related standard is essentially a loose pleading standard for EEOC complaints. *See id.* at 201.

■ In examining Spencer's EEOC charge, it is clear that her hostile work environment satisfies the reasonably related standard. In her EEOC complaint, she alleges "systemic" discrimination (Rasin Decl. Ex. M at D03412), and complains that her supervisor is hostile to her, in part, because of her color. (*Id.* at ¶ 49.) Additionally, she claims that her supervisor "demeans" her with "foul and offensive" language. (*Id.*) Read liberally, these complaints reasonably relate to Spencer's

hostile work environment claim before this Court because they relate to the "terms, conditions, and privileges" of Spencer's employment at McGraw–Hill. Accordingly, Spencer's hostile work environment claim is properly before this Court under Title VII.[8]

■ Spencer's hostile work environment claim is based solely on Caruso's conduct. She argues that Caruso created a hostile work environment by: 1) repeatedly calling women "bitches" and saying "shit" and "fuck" around African–American employees, and directing such profanity at her and other African–Americans; 2) taking away her job responsibilities after she complained about discrimination; 3) telling her that complaining minorities should leave; and 4) grabbing his crotch in front of her on one occasion. Spencer supports her claim with the evidence that she found Caruso's conduct to be so severe and pervasive that she requested a transfer out of the job that she loved.

While Caruso's actions, taken individually, might not rise to the level of a hostile work environment, a trier of fact should decide whether taken together they were sufficiently severe and pervasive. *See Williams v. Consolidated Edison Corp. of N.Y.,* 255 Fed.Appx. 546, 549 (2d Cir.2007) (citing, *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)).

Spencer's evidence, if believed, could allow a jury to infer that "these incidents [with Caruso] were frequent or continuous, interfered with [her] ability to do her work, and, as to some, were severe." *Id.*

---

8. The HRL and CHRL have an administrative exhaustion requirement, *Tessy Plastics Corp. v. State Div. of Human Rights,* 47 N.Y.2d 789, 791, 417 N.Y.S.2d 926, 391 N.E.2d 1007 (1979); *Hurwitz v. New York City Comm'n on Human Rights,* 142 Misc.2d 214, 535 N.Y.S.2d 1007, 1010–12 (N.Y.Sup.Ct.1988), but section 1981 does not. *Wilson v. Fairchild Republic Co., Inc.,* 143 F.3d 733, 739 n. 6 (2d Cir.1998), *overruled on other grounds by Slayton v. Am. Express Co.,* 460 F.3d 215 (2d Cir.2006).

Thus, the "cumulative effect" of Caruso's acts are enough to create issues of fact for trial. *Id.*

Accordingly, defendant's motion for summary judgment is denied.

### E. Constructive Discharge

 "An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." *Petrosino*, 385 F.3d at 229. To establish a constructive discharge claim, courts focus on two parts of the standard: 1) the employer's intentional conduct; and 2) the intolerability of the working conditions. *Id.*

 The intent requirement does not require a plaintiff to demonstrate specific intent. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000). If a plaintiff cannot show specific intent, "he or she must at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.' " *Petrosino*, 385 F.3d at 229–30 (*quoting Whidbee*, 223 F.3d at 74).

 The intolerability of an employee's work conditions is evaluated "objectively by reference to a reasonable person in the employee's position." *Petrosino*, 385 F.3d at 230. There must be evidence sufficient for a trier of fact to find that the working conditions "were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Spence v. Maryland Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir.1993) (quotation omitted). A plaintiff does not satisfy this evidentiary burden with evidence that employee merely found his working conditions difficult or unpleasant, or that the employee did not receive a raise, did not agree with criticisms of his performance, or preferred working somewhere else. *See id.*

 Spencer offers sufficient evidence for a jury to evaluate her constructive discharge claim.

She asserts the following: She asked for a transfer away from Caruso because of his conduct. She contends that the McGraw–Hill made the decision to transfer her to BIG, a division she did not want to go to after the company learned of her EEOC charge. She did not want to go to BIG because her job responsibilities would be reduced. She asserts that she only accepted the transfer because she felt she needed to in order to save her career.

Additionally, and more importantly, she contends her supervisor signed her negative performance review after receipt of the EEOC charge. She argues that another document, Caruso's review, is the "smoking gun" that proves her constructive discharge claim. It states, in part, "While we may have more optimism regarding redacted than Jesan [Spencer], *it will be up to Ken* [Caruso] *to ensure that he has effective relationships with his staff even if we pursue the route of counseling them out of the business.* This will not be easy recognizing that Kens [sic] natural style is one that is most likely more aggesive [sic] results oriented than either of these people are accustomed to [sic]." (Solotoff Decl. Ex. DD at D07600 (emphasis added).)

Finally, Spencer contends that the transfer to BIG was not necessary because Caruso was transferred to another division. She also offers evidence that after her transfer, Caruso wrote a "blistering" letter, to be placed in her HR file, that attacked her reputation.

McGraw–Hill responds to this evidence by arguing that Spencer's constructive discharge claim fails because her work condi-

tions were not intolerable. It contends that her evidence demonstrates only a reduction in job responsibilities, being dissatisfied with her job, and being dissatisfied with her transfer. *See Petrosino*, 385 F.3d at 231.

Furthermore, defendant argues that Spencer's claim fails because there is some evidence that Spencer left the company to pursue her dream of owning a business for herself. McGraw–Hill contends that when Spencer announced her resignation, her supervisor tried to convince her to stay, which refutes Spencer's argument that the company wanted her to leave.

The record in this case provides more than enough evidence, if believed, for a jury to find that Spencer felt compelled to resign from McGraw–Hill. Viewed most favorably, her evidence shows that McGraw–Hill embarked upon a campaign to take away her job responsibilities, and transfer her out of the job she loved unnecessarily, all in an effort to "counsel her out" of the company. Indeed, Spencer's "smoking gun" document—alone—is enough to get her to a jury. If believed, the document could allow a jury to infer that McGraw–Hill had plans to make her working conditions so intolerable that she would be forced to quit.

Defendant's arguments to the contrary, merely demonstrate that there are disputed issues of fact.

Accordingly, defendant's motion for summary judgment is denied.

### Conclusion

For the reasons stated above, defendant's motion for summary judgment is granted in part and denied in part. To summarize what remains of plaintiffs' claims; Henson may go to trial on her claims of race discrimination and retaliation, under all four statutes, for the HR Rep position, and—under section 1981 only—for the RSC position; Curtis may go to trial on her claims of discrimination and retaliation, under all four statutes, for her administrative assistant applications at S & P and at Structure Finance (reporting to Paul Kelly); and all of Spencer's claims—discrimination, retaliation, hostile work environment, and constructive discharge—under all four statutes, may go to trial.

The case is set for trial on *May 4, 2009*. The final pretrial conference, at which all evidentiary challenges to the admissibility of exhibits will be resolved, will be held on *April 17, 2009, at 2 o'clock* in Judge McMahon's courtroom. At the final pretrial conference, the parties must finally identify all witnesses who will testify and be prepared to argue all objections to exhibits. In limine motions are due by *March 20, 2009*; responses are due by *March 30, 2009*. The Court does not accept replies on in limine motions. All in limine motions will be decided on the record at the final pretrial conference.